IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM MICHAEL JONES,                          00-CV-1795-BR

       Plaintiff,                          OPINION AND ORDER

v.

ROBERT ROSE, *et al.*,

       Defendants.


**WILLIAM MICHAEL JONES**
2716 N.E. Mason St.
Portland, OR 97211
(503) 284-0502

       Plaintiff, *Pro Se*

**ROBERT J. TENPAS**
Acting Assistant Attorney General
**CYNTHIA J. MORRIS**
**DAVID KAPLAN**
Environmental & Natural Resource Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-23986
(202) 616-7554

1 - OPINION AND ORDER

**SAMANTHA KLEIN**
Natural Resources Section
P.O. Box 663
Washington D.C. 20044
(202) 305-0474

         Attorneys for Federal Defendants

**LINDA MENG**
City Attorney
**TERENCE L. THATCHER**
Deputy City Attorney
1200 S.W. Fourth Ave.
Portland, OR 97210
(503) 823-4047

         Attorneys for City of Portland Defendants

**JEFFREY W. LEPPO**
**LAURIE K. BEALE**
Stoel Rives LLP
600 University St., Suite 3600
Seattle, WA 98101
(206) 624-0900

         Attorneys for Defendant Port of Portland


**BROWN, Judge.**

      This matter comes before the Court on multiple evidentiary

Motions and Cross-Motions for Summary Judgment and/or Partial

Summary Judgment filed by Plaintiff and Defendants Army Corps

of Engineers, Port of Portland, and City of Portland as to

Plaintiff's claims under the Administrative Procedure Act (APA),

5 U.S.C. § 551, *et seq.;* the Clean Water Act (CWA), 33 U.S.C.

§ 1251, *et seq.;* and the National Environmental Policy Act

(NEPA), 42 U.S.C. § 4321.


2  - OPINION AND ORDER

For the reasons explained herein, the Court makes the following rulings:

## I. RULINGS ON EVIDENTIARY MOTIONS

**A.**  The Court **GRANTS** the Port's Motion to Strike Plaintiff's 25th Affidavit (#703) in its entirety.  The Port's Motion to Strike is incorporated in its Motion for Partial Summary Judgment (#752).

**B.**  The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 19th Affidavit (#707).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#753).

**C.**  The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 20th Affidavit (#876), 21st Affidavit (#736), and 8th Motion for Judicial Notice (#736).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#767).

**D.**  The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 22nd Affidavit (#740).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#768)**,** and the Corps joins in the Port's Motion to Strike**.**

**E.**  The Court **DENIES as moot** the Corps's Motion to Strike (#800) Plaintiff's 20th Affidavit (#876), 21st Affidavit (#736), 22nd Affidavit (#740), and 29th Affidavit (#741) on the ground that it

3  - OPINION AND ORDER

is superseded by the Corps's Motion to Strike (#923).

**F.**    The Court **GRANTS in part** and **DENIES in part** the Corps's
Motion to Strike (#923) Plaintiff's 20th Affidavit, **GRANTS** the
Corps's Motion to Strike (#923) Plaintiff's Amended 29th
Affidavit (#879), **GRANTS in part** and **DENIES in part** the Corps's
Motion to Strike (#923) Jeri Benton's Affidavit (#880), and
**DENIES** the Corps's Motion to Strike (#923) Clive F. (Rick)
Kienle, Jr.'s First Affidavit (#881).  The Port joins in the
Corps's Motion to Strike Jeri Benton's Affidavit and Kienle's
First Affidavit.

**G.**    The Court **GRANTS** the Port's Motion to Strike (#962) Clive F.
(Rick) Kienle, Jr.'s Second Affidavit (#943).


## II.   RULINGS ON SUMMARY-JUDGMENT MOTIONS

### A.   APA Claim - ATF Permit.

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary
Judgment (#725) that the Corps's issuance of the 2005 After-the-
Fact Permit 200100062 (ATF Permit) to the Port was arbitrary,
capricious, and otherwise contrary to law.

2.    The Court **GRANTS** the Port's Cross-Motion for Partial
Summary Judgment (#761) and **GRANTS** the Corps's Cross-Motion for
Summary Judgment (#846).

**B.   <u>APA Claim - Verification of Boundary Change</u>.**

    1.   The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#729) that the Corps's issuance of the 2006 Verification of Permanent Change of Boundaries (Verification of Boundary Change) for purposes of CWA jurisdiction was arbitrary, capricious, and otherwise contrary to law.

    2.   The Court **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#768) and **GRANTS** the Corps's Cross-Motion for Summary Judgment (#849).

**C.   <u>APA Claim - 1998SEIS, 2003CDEIS, ATF Permit</u>.**

    1.   The Court **DENIES as moot** Plaintiff's Motion for Partial Summary Judgment (#719) that the Corps violated the APA by failing to comply with Executive Order (EO) 11988 when it issued the 1998 Supplemental Environmental Impact Statement (1998SEIS) and also **DENIES** Plaintiff's Motion as to the 2003 Channel-Deepening Environmental Impact Statement (2003CDEIS) and the ATF Permit to the Port.

    2.   The Court **GRANTS** the Port's Motion for Partial Summary Judgment (#767) as to Plaintiff's APA claim and **GRANTS** the Corps's Cross-Motion for Summary Judgment (#827).

**D.   <u>NEPA Claim - 1998SEIS, 2003CDEIS, ATF Permit</u>.**

    1.   The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#716) that the Corps's 1998SEIS, 2003CDEIS, and ATF

5 - OPINION AND ORDER

Permit did not comply with NEPA.

    2.    The Court **GRANTS** the Port's Motion for Partial Summary Judgment (#767) as to Plaintiff's NEPA claim and **GRANTS** the Corps's Cross-Motion for Summary Judgment (#824).

**E.   <u>CWA Claim - Containment Dike, Wet Meadow</u>.**

    1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#700) that the Port did not have a CWA permit when it used dredged spoils to build a containment dike on West Hayden Island (WHI) in 1997 and filled the "Wet Meadow" from 1995-97.[1]

    2.    The Court **DENIES as moot** the Port's Cross-Motion for Partial Summary Judgment (#752) as to Plaintiff's claim that the Port filled 1.19 acres of wetlands on WHI without a CWA permit and **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#752) that the Port did not fill an additional 20 acres of waters on WHI without a CWA permit.

**F.   <u>CWA and APA Claim - Tide Gates, Culverts</u>.**

    1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#704) that the Port unlawfully installed tide gates and culverts at WHI in violation of the CWA and the APA.

    2.    The Court **GRANTS in part** and **DENIES in part** the Port's Cross-Motion for Partial Summary Judgment (#753).

---

[1] The term "Wet Meadow" was coined by Plaintiff and does not have an official meaning.

**G.**  <u>**CWA Claim - Lot 100**</u>.

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#708) that the City unlawfully filled a wetland on Lot 100 adjacent to Canoe Bay on WHI.

2.    The Court **DENIES** the City's Cross-Motion for Summary Judgment (#766).

**H.**  <u>**CWA Claim - Permit #1482**</u>.

1.    The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment (#712) that the City is liable for the unpermitted discharge of dredged spoils on WHI in an area not covered by Permit #1482 and **DENIES** the remainder of Plaintiff's Motion.

2.    The Court **DENIES** the City's Cross-Motion for Summary Judgment (#781) limiting its liability for the unpermitted discharge of dredged spoils on WHI to 1813 acres with leave to renew after the Corps completes its review of the City's proposed restoration plan.

3.    The Court **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#760) that it is not liable for the City's unpermitted disposal of dredged spoils in an area of WHI not covered by CWA Permit #1482.

**I.**  <u>**Ninth Amendment Constitutional Claim**</u>.

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#723) in which he seeks "Declaratory Relief" that the

Corps violated Plaintiff's right under the Ninth Amendment to
the United States Constitution to access Public Trust Lands on
WHI by failing to comply with the Water Rights Development Act,
33 U.S.C. § 2211(a) and (b), and its implementing regulations.

2.    The Court **GRANTS** the Corps's Cross-Motion for Summary
Judgment (#820).

### III.    BACKGROUND

The nature of this case and its tortuous path over the past
seven years is described in numerous Opinions and Orders that
resolve earlier summary-judgment motions as set forth in the
attached Appendix.  Briefly, however, Plaintiff filed a Complaint
in December 2000 against federal, state, city, and other
governmental and nongovernmental entities arising from the
disposal of dredged spoils into wetlands on WHI.  Plaintiff
alleges Defendants' conduct and the consequences of that conduct
give rise to claims under the CWA, NEPA, the APA, and the Ninth
Amendment to the United States Constitution.

This case was originally assigned to the Honorable Robert E.
Jones, United States District Judge, who dismissed some of
Plaintiff's claims.  On June 23, 2004, the case was reassigned to
this Court for all further proceedings.

On September 20, 2004, and September 9, 2005, this Court
issued Opinions and Orders that resolved multiple dispositive

motions, which further reduced the number and scope of Plaintiff's remaining claims and also resulted in the dismissal of all Defendants except the Corps, the Port, and the City.

Given the vast judicial efforts undertaken to date in this case, this Court will not reconsider its prior dispositive rulings nor the dispositive rulings of Judge Jones.

## IV. **STATUTORY STANDARDS**

### A. **APA.**

The APA provides an agency decision may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is appropriate for resolution of factual disputes "implicat[ing] substantial agency expertise." *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

Review of an agency decision by the district court is narrow, and the reviewing court may not substitute its judgment for that of the agency. *See United States Postal Serv. v. Gregory*, 122 S. Ct. 431, 434 (2001).  The reviewing court's inquiry, although narrow, must be searching and careful. *Ninilchik*, 227 F.3d at 1194.

The court generally must defer to an agency's interpretation of its own regulations unless the agency's construction is

9  - OPINION AND ORDER

clearly erroneous or inconsistent with the plain meaning of the regulations. *Friends of the Cowlitz and CPR-Fish v. FERC*, 253 F.3d 1161, 1166 (9th Cir. 2001). *See also Partridge v. Reich*, 141 F.3d 920, 923 (9th Cir. 1998). The court is not required to defer to the agency when the agency has not formulated an official interpretation of the regulation but merely advances a litigation position. *United States v. Trident Seafoods, Inc.*, 60 F.3d 556, 559 (9th Cir. 1995).

The agency must articulate a rational connection between the facts, the law, and the conclusions reached. *Midwater Trawlers Co-Op v. Dep't of Commerce*, 282 F.2d 710, 716 (9th Cir. 2002). The reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment. *Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). The court may reverse the agency's decision if the agency relied on factors that Congress did not intend it to consider, failed to consider an important aspect of the issue, offered an explanation for its decision that runs counter to the evidence before the agency, or made a decision that was so implausible that it could not be ascribed to a difference in view or to the agency's expertise. *See Pac. Coast Fed. of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).

The APA requires a court that is evaluating an agency action

to "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  The court's review must "be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Because the court's review is confined to the administrative record that existed at the time of the agency's decision, it may not include "some new record made initially in the reviewing court." *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992)(citing *Camp v. Pitts*, 411 U.S. 138 (1973)).  "To ensure fair review of an agency action, therefore, the court 'should have before it neither more nor less information than did the agency when it made its decision.'" *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997)(internal citation omitted).  Thus, the record must include all documents and materials that the agency "'directly or indirectly considered'" at the time it made its decision. *Fund for Animals v. Williams*, 245 F. Supp. 2d 49, 55 (D.C. Cir. 2003). *See also Thompson v. Dep't of Labor,* 885 F.2d 551, 555 (9th Cir. 1989); *Water Land Exch. Project v. Dombeck*, 47 F. Supp. 2d 1196, 1205 (D. Or. 1999).

There are narrow exceptions to this general rule:  In limited circumstances, district courts are permitted, in the

11 - OPINION AND ORDER

exercise of their discretion, to admit extra-record evidence (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith." *S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)(internal citation and quotation marks omitted). "These limited exceptions operate to identify and plug holes in the administrative record.  Though widely accepted, these exceptions are narrowly construed and applied." *Id.*

**B.    NEPA.**

"NEPA has twin aims:  First, it places upon a federal agency the obligation to consider every significant aspect of the environmental impacts of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).  "NEPA does not contain substantive environmental standards" but instead "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Id.* (quoting *Metcalf v. Daley*, 214 F.3d 1135,

1141 (9th Cir. 2000)).  NEPA, therefore, requires federal agencies
to prepare an environmental impact statement (EIS) before taking
"major Federal actions significantly affecting the quality of the
human environment."  42 U.S.C. § 4332(2)©).  The agency's first
step, however, is to determine whether the proposed action is
categorically exempted from environmental review.

To prevail on a claim that the agency violated its statutory
duty to prepare an EIS, a "plaintiff need not show that
significant effects will in fact occur."  *Idaho Sporting Congress
v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).  The plaintiff
must only raise substantial questions as to whether a project may
have a significant effect on the environment.  *Id*.

**C.   CWA.**

The CWA prohibits the discharge of any "pollutant" into
"navigable waters" unless authorized by a permit issued by
the Corps.  33 U.S.C. §§ 1311(a), 1344(a), and 1362(12).
"Pollutants" may include "dredged or fill materials."  *Leslie
Salt Co. v. U.S.,* 55 F.3d 1388, 1391 (9th Cir. 1995).  "Navigable
waters" are defined as "waters of the United States," which
include waters that can be used in "interstate or foreign
commerce including all waters which are subject to the ebb and
flow of the tide," "wetlands," "[w]etlands adjacent to waters"
that are not themselves wetlands, "wet meadows," and "waters that
are or could be used for industrial purposes by industries in

13 - OPINION AND ORDER

interstate commerce."  33 U.S.C. § 1362(7); 33 C.F.R. § 328.3.

The Court must defer to the Corps's interpretation of the CWA if it is reasonable and does not conflict with the expressed intent of Congress.  *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 131 (1985).  *See also Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 844-45 (1984).


## V.   <u>SUMMARY-JUDGMENT STANDARDS</u>

Fed. R. Civ. P. 56©) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Villiarmo,* 281 F.3d at 1061.  A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d

1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary.  *Wong v. Regents of Univ. of Cal.,* 379 F.3d 1097 (9th Cir. 2004), as amended by 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod. Inc.,* 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

## VI.    EVIDENTIARY MOTIONS

Plaintiff repeatedly supports his Motions for Summary Judgment with "evidence" in the form of affidavits that contain a mix of inferences drawn from his testimony, argument, and accusations as well as unauthenticated and/or cropped and marked photographs and other documents, some of which are drawn from administrative records.  The Court, in turn, has previously rejected in whole or in part similar affidavits submitted by Plaintiff in support of earlier summary-judgment motions.  *See, e.g.,* Opin. and Order at 53, 72 (issued Sept. 9, 2005).

A.    **The Port's Motion to Strike Plaintiff's 25th Affidavit (#703)**.

Plaintiff submits his 25th Affidavit in support of his Motion for Summary Judgment (#700) that the Port violated the CWA by disposing of fill material on WHI wetlands without a permit.  In its Motion for Partial Summary Judgment (#752), the Port moves to strike Plaintiff's 25th Affidavit on the grounds that it contains unauthenticated photographs apparently provided by the Port on which Plaintiff has overlaid his own markings and added commentary about what the photographs and attached documents purport to represent, the inferential facts that he draws from the photographs, and his arguments.

As noted, the Court repeatedly has rejected the same type of evidence that Plaintiff submits in his 25th Affidavit, and the Court does so again.  Plaintiff has not met the basic requirement under Federal Rule of Evidence 901(a) of establishing that the unauthenticated, altered photographic and documentary evidence accurately depicts or reflects Plaintiff's claims or inferences. In addition, Plaintiff has failed to establish that he is qualified to offer the technical and scientific opinions interwoven throughout his mostly argumentative commentary as to what is depicted or reflected.  *See* Fed. R. Evid. 701, 702(a).

Accordingly, the Court **GRANTS** the Port's Motion to Strike Plaintiff's 25th Affidavit in its entirety.

16 - OPINION AND ORDER

**B.**    **The Port's Motion to Strike Plaintiff's 19th Affidavit (#707)**.

Plaintiff submits his 19th Affidavit in support of his Motion for Summary Judgment (#704) that the Port violated the CWA by installing culverts and tide gates on a road that restricted the reach and flow of United States waters on WHI.  Plaintiff's 19th Affidavit includes seven Appendices.  In its Cross-Motion for Partial Summary Judgment (#753), the Port moves to strike Plaintiff's 19th Affidavit and the Appendices attached.

Appendix 1 is a copy of a letter from the Corps to the Port that is part of the Administrative Record (AR) filed by the Corps and pertains to the Corps's 1997 "Halloween Delineation"[2] marking the Ordinary High Water Mark on WHI.  Appendices 2, 3, 4, 5, and 6 include unauthenticated, digitally manipulated, and cropped photographs to which Plaintiff's commentary is attached. Appendix 4 also includes the Corps's memorandum dated August 15, 2006, that is part of the Administrative Record for the Corps's ATF Permit.  Appendix 7 includes Plaintiff's "testimony," excerpts from the Administrative Record, Plaintiff's argumentative commentary, and a cropped diagram and photograph.

The Port objects to Appendix 1 on the ground that it is irrelevant because the CWA does not provide a private right of action under its citizen-suit provisions for a claim that the

_____

    [2] The "Halloween Delineation" is a term coined by Plaintiff that does not have an official meaning.

Port unlawfully restricted the reach and flow of waters of the United States, which, according to the Port, is the gravamen of Plaintiff's claim.  The Port objects to the remaining Appendices on several grounds including lack of authenticity as to photographs, hearsay, and Plaintiff's lack of qualification as an expert as to his "testimony."

After reviewing the record, the Court will consider Appendix 1 except for Plaintiff's commentary.  The Court also will consider the Corps's August 15, 2006, memorandum included as part of Appendix 4.  For the reasons stated as to Plaintiff's 25th Affidavit, the Court strikes all other materials from Plaintiff's 19th Affidavit.

Accordingly, the Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 19th Affidavit.

C.    **The Port's Motion to Strike Plaintiff's 20th Affidavit (#876), 21st Affidavit (#736), and 8th Motion for Judicial Notice (#736).**

1.    **20th Affidavit (#876)**.

Plaintiff submits his 20th Affidavit (#876) in support of his Motion for Summary Judgment (#716) that the Corps violated NEPA when it issued the 1998SEIS and 2003CDEIS and violated the APA when it issued the ATF Permit.  Plaintiff's Affidavit includes five Appendices accompanied by Plaintiff's "Discussion of Authenticity and Relevancy."

Appendix 1 includes documents that are part of the

Administrative Record for the 2003CDEIS.  Appendix 2 includes a
cover page and a copy of a document that Plaintiff asserts the
Corps used in its flood-plain analysis for the ATF Permit in
addition to Plaintiff's commentary.  Appendix 3 includes copies
of a notice in the Federal Register from 1994 titled "Intent to
Prepare a Draft Supplement to the Columbia River and Lower
Willamette River Environmental Impact Statement, July 1975" and a
notice in the Federal Register from 1998 purportedly titled
"Intent to Prepare a Draft Environmental Impact Statement (DEIS)
for West Hayden Island Development, Multnomah County, Oregon."
Appendix 4 includes lengthy argument by Plaintiff regarding a
prior "Elevation" permit process under § 404(q) of the CWA, 33
U.S.C. § 1344(q), by which WHI was purportedly identified as a
Special Aquatic Area of national significance.  Appendix 5
includes a one-page excerpt from the 1994EA Administrative Record
and four pages of photographs or diagrams that have been
manipulated by Plaintiff and that are accompanied by his
commentary.

In its Cross-Motion for Partial Summary Judgment (#767), the
Port moves to strike Plaintiff's 20th Affidavit and attached
Appendices on the ground that they include documents that are not
part of the Administrative Records filed in this case.  Moreover,
the Port points out that Plaintiff has failed to identify which

exception to the limited scope of APA review, if any, permits consideration of such extra-record materials.

After reviewing the record, the Court will consider Appendix 1 to the extent it includes documents in the Administrative Records filed in this case.

The Court also will consider other unaltered copies of documents taken from the Administrative Records filed in this case relating to the specific agency actions under review; *i.e.*, Appendix 3, pp. 3-4; Appendix 4, pp. 16-18; and Appendix 5, pp. 1-2.

For the reasons stated as to Plaintiff's 25th Affidavit and because Plaintiff has not provided a basis to allow the addition of extra-record materials, the Court strikes all other materials in Plaintiff's 20th Affidavit.

### 2. **21st Affidavit (#736).**

Plaintiff submits his 21st Affidavit (#736) in support of his Motion for Summary Judgment (#719) on his APA claim that the Corps failed to comply with EO 11988, which relates to "Floodplain Management."

Appendix 1 to Plaintiff's 21st Affidavit is a copy of Executive Order 11988. Appendix 2 includes FEMA maps offered as "representations of the Floodplain on [WHI]" and include Plaintiff's commentary. Appendix 3 contains in part "demonstrative" photographs and diagrams purporting to show

"Floodplain Impacts" on WHI accompanied by Plaintiff's commentary, but Appendix 3 also includes memoranda from the Administrative Records for the 2003CDEIS and the ATF Permit. Appendix 4 includes documents in the Administrative Record for EO 11988. Appendix 5 is a copy of a section of the Code of Federal Regulations.

In its Cross-Motion for Summary Judgment (#767), the Port objects to Appendices 2 and 3 because they include materials that are not in the Administrative Records filed in this case. The Court agrees Appendix 2 and some parts of Appendix 3 contain inappropriate extra-record materials.

For the reasons stated as to Plaintiff's 25th Affidavit, the Court strikes Appendix 2 and Appendix 3, pp. 1-3, because they include inappropriate extra-record materials. The Court, however, will consider the materials in Appendix 1; Appendix 3, pp. 4-5; and Appendices 4 and 5 because they are part of the Administrative Records filed in this case or are agency regulations that may apply to Plaintiff's claims.

**3.   8th Motion for Judicial Notice (#736)**.

In his 8th Motion for Judicial Notice, Plaintiff requests the Court to take judicial notice of the facts contained in each of the five Appendices that are part of Plaintiff's 21st Affidavit. In its Cross-Motion for Summary Judgment (#767), the Port objects

on the ground that Plaintiff's request is merely an effort to circumvent evidentiary requirements that Plaintiff cannot satisfy.

Under Fed. R. Evid. 201(b), the Court may judicially notice a fact that is "not subject to reasonable dispute."  The Court has previously determined it will consider Appendices 1, 4, and 5.  The Court, therefore, deems "noticed" the facts in those Appendices.  Plaintiff, however, also asks the Court to judicially notice "facts" in Appendices 2 and 3 that relate to his APA claim as to EO 11988.  Those facts include Plaintiff's representations and commentaries as to what constitutes the floodplain on WHI, and those facts are vigorously disputed by the Port.  Moreover, the Court will not consider Appendix 2 and Appendix 3 (except pages 1-3) for the reasons stated as to Plaintiff's 25th Affidavit and because they are not part of the Administrative Record on the APA claim as to EO 11988.

In summary, the Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 20th Affidavit, 21st Affidavit, and 8th Motion for Judicial Notice.

**D.    The Port's Motion to Strike Plaintiff's 22nd Affidavit (#740) filed by the Port and joined by the Corps.**

Plaintiff submits his 22nd Affidavit (#740) in support of his Motion for Partial Summary Judgment (#729) on his claim that the Corps's Verification of Boundary Change decision, which determined CWA jurisdiction on WHI, violated the APA.

Appendix 1, § 1, pp. 1-3, are handwritten pages of notes from an October 14, 2005, Port meeting and are part of the Administrative Record. Appendix 1, § 1, p. 4, represents Plaintiff's effort to provide a typed transcription of the meeting notes with commentary. Appendix 1, § 2, pp. 5-8, includes cropped documents from the Administrative Record accompanied by Plaintiff's testimony and commentary as to their meaning. Appendix 2 includes unauthenticated charts, comparative figures, and handwritten memoranda that are not included in the Administrative Record and that are accompanied by Plaintiff's testimony and commentary. Appendix 3, pp. 1-2, includes an extract from a book accompanied by Plaintiff's commentary as to its significance. Appendix 4 is Plaintiff's commentary that incorporates by reference materials relating to whether WHI is a "Special Aquatic Area."

In its Cross-Motion for Partial Summary Judgment (#767), the Port moves to strike these materials on the grounds that Appendix 1 duplicates materials already in the Administrative Record, Appendices 2 and 3 are unauthenticated extra-record materials, and Appendix 4 merely incorporates materials related to a purported "Special Aquatic Area" that were presented in other Affidavits (*e.g.,* Plaintiff's 20th Affidavit, Appendix 4). The Port also reiterates in its Memorandum in Opposition to Plain-tiff's Motion for Partial Summary Judgment as to the Corps's

23 - OPINION AND ORDER

Verification of Boundary Change decision that the Court should disregard any evidence that was not part of the Administrative Record, including most of Plaintiff's 22nd Affidavit.  The Corps joins in the Port's Motion and also argues Plaintiff's statements in his 22nd Affidavit should not be considered because he did not raise them in his comments made in response to the Corps's November 10, 2005, Public Notice.

Plaintiff, however, contends the Corps made its Verification of Boundary Change decision without affording any party the opportunity to comment on the decision other than the Port. Plaintiff asserts he would have submitted all of the materials in his 22nd Affidavit if he had known about the Corps's "true intentions" to construct a "faux record with only their evidence," but he understood the Corps's Public Notice addressed only the Corps's proposed mitigation plan for the 20 acres filled by the Port.

The Court has reviewed the Administrative Record and finds it reflects the Port was aware that the Corps was "still engaged in the process of considering the limits of its jurisdiction under the [CWA at WHI]."  The Port, therefore, asserted its point of view with the hope that the Corps's decision would be favorable to the Port.  *See* AR 195-200.

On this record, the Court concludes it is disingenuous for either the Corps or the Port to object to the Court's consideration of the materials in Plaintiff's 22nd Affidavit. The Court does not doubt Plaintiff would have inserted these materials in the Administrative Record if he had thought there was a reason to do so.  Although the Court does not ascribe any bad faith to the Corps or to the Port on this issue, the Court, under these circumstances and in the exercise of its discretion, will consider the materials attached to Plaintiff's 22nd Affidavit even though they are not part of the Administrative Records.  The Court strikes only Plaintiff's typed transcript of handwritten notes that are already part of the Administrative Record on the ground that the original handwritten notes suffice.  The Court will consider the remaining materials as if they had been filed with the original Administrative Records.

Accordingly, the Court **GRANTS in part** and **DENIES in part** the Motion to Strike Plaintiff's 22nd Affidavit filed by the Port and joined by the Corps.

**E.    The Corps's Motion to Strike (#800) Plaintiff's 20th Affidavit (#876), 29th Affidavit (#741), Benton Affidavit (#880), and Kienle First Affidavit (#881).**

The Corps's Motion to Strike (#800) is superseded by its Motion to Strike (#923) and, therefore, is **DENIED as moot.**

**F.** **Motion to Strike (#923) Plaintiff's 20th Affidavit (#876) and Amended 29th Affidavit (#879) filed by the Corps; the Motion to Strike (#923) the Benton Affidavit (#880) and the Kienle First Affidavit (#881) filed by the Corps and joined by the Port.**

**1.** **20th Affidavit (#876)**.

The Corps moves to strike Plaintiff's 20th Affidavit on grounds almost identical to those of the Port in its Motion to Strike Plaintiff's 20th Affidavit incorporated in its Cross-Motion for Summary Judgment (#767).  The Court, therefore, adopts its earlier ruling as to Plaintiff's 20th Affidavit for the reasons set forth earlier and **GRANTS in part** and **DENIES in part** the Corps's Motion.

**2.** **Amended 29th Affidavit (#879)**.

Plaintiff submits his Amended 29th Affidavit in support of his Motion for Partial Summary Judgment (#723) as to his claim of a Ninth Amendment right of access to Public Trust lands on WHI.  Plaintiff's Amended 29th Affidavit consists of Plaintiff's "testimony" and argument as well as two Appendices containing unauthenticated photographs, some of which have been cropped and marked and all of which include commentary by Plaintiff as to what is depicted in the photographs.

For the reasons stated in the Court's Rulings as to Plaintiff's 25th Affidavit, the Court **GRANTS** the Corps's Motion to Strike Plaintiff's Amended 29th Affidavit in its entirety.

26 - OPINION AND ORDER

### 3. __Benton Affidavit (#880)__.

Plaintiff submitted the Affidavit of Jeri Benton in support of Plaintiff's Motion for Partial Summary Judgment (#723) that the Corps violated his constitutional right under the Ninth Amendment of access to Public Trust lands on WHI.  Benton states she lived on WHI for five years.  In 1993 she witnessed the installation of fences and locked gates and the building of a road on WHI.  She thought the government was starting to use WHI as a military base.  She became so intimidated that she stopped walking her dog along the beaches.  At a later date, she met Plaintiff, who informed her that she had a public trust right of access to the beaches on WHI that was being denied to her and others.

The Benton Affidavit also includes a recitation of statements made to Benton by neighbors regarding their assumptions as to what was happening and by a "client (Jay)" as to "what the area looks like now" as well as Benton's conjecture on the Port's future plans for development on WHI.

The Corps, joined by the Port, moves to strike the Benton Affidavit on the ground that it "consists solely of unsupported factual statements completely outside of any administrative record."  The objections of the Corps and the Port, however, do not have merit.  The Benton Affidavit is directed to Plaintiff's claim that the Corps denied Plaintiff's constitutional right of

public access to lands on WHI, and the evidence as to that claim
is not limited to any Administrative Record.  Benton's sworn
testimony that she witnessed activities that may have resulted in
the blockage of certain roads and access to beaches on WHI and
that she experienced the consequences is probative as to whether
public access was denied.  The Court, therefore, will consider
these portions of Benton's Affidavit to the extent that they may
be relevant.

Benton's statements about what she was told by Plaintiff or
others, however, are inadmissible hearsay.  In addition, Benton's
remaining comments in the form of opinions, assumptions, and
conjecture are irrelevant in that they do not have a "tendency to
make the existence of any fact that is a consequence to the
determination of the [issue] more probable than it would be
without the evidence."  *See* Fed. R. Evid. 401.

In summary, the Court will consider Benton's statements as
to the construction activities that she witnessed on WHI and the
effect of those activities on her ability to gain access to WHI
beaches.  The Court will not consider the remaining portions of
Benton's Affidavit.

### 4.  Clive F. (Rick) Kienle, Jr.'s First Affidavit (#881).

Plaintiff submitted the First Affidavit of geologist Clive
F. (Rick) Kienle, Jr., in support of his Motion for Partial
Summary Judgment (#723) on his constitutional claim that the

Corps improperly denied him access to public land on WHI.

Kienle states he visited WHI with Plaintiff in June 2007 and reviewed aerial photographs taken in 1964 that showed a water connection from the Columbia River to the interior of WHI. Kienle reports his observations in June 2007 of a fenceline channel now filled with dredged material that had formed a "plug" in the channel, a pre-existing cattle grate that had been moved to effectively dam the channel, and "no trespassing" signs. He opined the placement of the plug and the moving of the cattle grate effectively isolated the interior wetlands from the Columbia River.

The Corps, joined by the Port, moves to strike Kienle's First Affidavit on the ground that it includes materials that "are not part of the administrative records" in this case. This objection again misses the mark because Plaintiff submitted Kienle's First Affidavit in support of his constitutional claim rather than his APA or NEPA claims and, therefore, may offer otherwise admissible extra-record materials in support of this claim. The Court, therefore, will consider the Kienle First Affidavit for that purpose only.

Accordingly, the Court **GRANTS in part** and **DENIES in part** the Motion to Strike (#923) Plaintiff's 20th Affidavit, **GRANTS** the Motion to Strike Plaintiff's Amended 29th Affidavit (#879), **GRANTS in part** and **DENIES in part** the Motion to Strike Jeri Benton's

29 - OPINION AND ORDER

Affidavit (#880), and **DENIES** the Motion to Strike Clive F. (Rick) Kienle, Jr.'s First Affidavit (#881) as noted.

**G.    The Port's Motion to Strike (#962) Clive F. (Rick) Kienle, Jr.'s Second Affidavit (#943).**

The Port moves to strike Kienle's Second Affidavit submitted in support of Plaintiff's Motion for Partial Summary Judgment (#704) on his CWA claim against the Port arising from the Port's installation of culverts and tide gates on WHI.  The Port contends Kienle's Second Affidavit is both untimely and in violation of Federal Rule of Civil Procedure 34(a), which requires Plaintiff to obtain the Port's permission for either he or his expert to inspect, to survey, and/or to photograph the property in question.  The Port also contends Kienle has failed to establish that he is qualified to offer his opinions as an expert.  Finally, the Port asserts Kienle's opinions are based on his review of hearsay documents for which no adequate foundation has been established.

The Court agrees with the Port that Kienle's Second Affidavit is untimely.  Moreover, the record does not reflect Plaintiff complied with Federal Rule of Civil Procedure 34(a) when he obtained the information set forth in this Affidavit.

Accordingly, the Court **GRANTS** the Port's Motion to Strike Kienle's Second Affidavit.

## VII.    <u>SUMMARY-JUDGMENT MOTIONS</u>

The resolution of several of the parties' summary-judgment motions depends in part on the validity of the Corps's agency actions as to the ATF Permit and Verification of Boundary Change. The Court, therefore, first addresses the summary-judgment motions and cross-motions as to those agency actions.

## A.    <u>Plaintiff's APA Claim that the Corps's issuance of the ATF Permit to the Port was arbitrary, capricious, and contrary to law.</u>

Plaintiff moves for summary judgment under the APA that the Corps's issuance of the ATF Permit to the Port authorizing the Port's 1996 disposal of dredged material into 1.19 acres[3] of wetlands on WHI was arbitrary, capricious, and otherwise contrary to law.  The Corps and the Port, however, move for summary judgment that the ATF Permit, as amended following the Corps's Verification of Boundary Change decision, constitutes a valid final agency action.

### 1.    <u>Background.</u>

When it disposed of the dredged spoils, the Port relied on a 1995 wetlands delineation (Fishman Delineation) for WHI that had been prepared by its consultant, Fishman Environmental Services, for the purpose of identifying an appropriate non-wetlands

---

[3] The unauthorized fill has been described elsewhere as encompassing 1.18 acres.  For purposes of this case, the Port does not challenge that the fill covered 1.19 acres.

dredged spoils disposal site on WHI for which a § 404 Permit would not be required.  The Fishman Delineation indicated the Ordinary High Water Mark on WHI was between 12 and 13 feet National Geodetic Vertical Datum (NGVD).

In response to the Fishman Delineation, the Corps issued its own 1997 "Halloween Delineation," which reflected the Ordinary High Water Mark was 17.3 feet.  As a result, the total area of wetlands on WHI increased from 20.49 acres to 30.89 acres.

In 1998 the Port reported to the Corps that, in light of the fact that the additional wetlands found by the Corps in the 1997 Halloween Delineation and a survey benchmark used to determine elevations for wetlands on WHI had subsided by six inches, the Port's 1996 dredge-disposal activities resulted in an inadvertent filling of 1.19 acres of wetlands on WHI.

In January 2001, the Port, joined by the Corps and the Oregon Department of State Lands, filed an application for an After-the-Fact Permit to authorize both the inadvertent filling of the 1.19 acres of wetlands and the proposed mitigation plan that included creating an additional two acres of wetland and enhancing existing wetlands.

Completion of the permit-application process was suspended until Judge Jones resolved CWA jurisdictional issues.  In 2004 Judge Jones resolved these issues by rejecting Plaintiff's challenge that the Corps failed to follow procedures outlined in

32 - OPINION AND ORDER

the Corps's 1987 Wetlands Delineation Manual when it issued its 1997 Halloween Delineation establishing CWA jurisdictional limits on WHI.  *See* Opin. and Order (issued Mar. 19, 2004).

In November 2005, the Corps granted the Port's ATF Permit application based on a Department of the Army Environmental Assessment and Statement of Findings (SOF) that "there were no practicable alternatives available [for dredged spoils disposal] which do not involve a discharge of dredged fill or fill material into Waters of the United States."  ATF AR Ex. 15.

    2.   **Plaintiff's Motion for Partial Summary Judgment (#725)**.

Plaintiff's only grounds for challenging the Corps's original ATF Permit decision are (1) the Corps improperly relied on the 1997 Halloween Delineation as the basis for determining the extent of the wetlands filled by the Port in 1996 and (2) the unpermitted disposal ratified by the issuance of the ATF Permit in 2005 occurred before the Halloween Delineation was issued in 1997.  Judge Jones, however, specifically rejected the same arguments in 2004 and found the record supported the Corps's contention that the 1997 Halloween Delineation was based on topographical data gathered in 1993 before the unpermitted dredge disposal took place and that "the record in this case demonstrates . . . Fishman and the Corps adhered to the guidelines set forth in the 1987 Manual."  *See* Opin. and Order at 16, 19 (issued Mar. 19, 2004).

33 - OPINION AND ORDER

Both the Port and the Corps urge the Court to follow Judge Jones's previous ruling on the validity of the Halloween Delineation and to deny Plaintiff's Motion for Summary Judgment. On this record, the Court concludes Judge Jones's ruling is dispositive as to the issue raised by Plaintiff in this Motion.

Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment.

### 3. <u>Cross-Motions for Summary Judgment of the Port (#761) and the Corps (#846)</u>.

The Port and the Corps assert the validity of the ATF Permit issued in November 2005 is supported in the Administrative Record, issuance of the ATF Permit complied with applicable regulations, and issuance of the ATF Permit was based on the jurisdictional wetlands delineation on WHI that was previously upheld by Judge Jones.  The Court agrees.  Thus, for all the reasons stated above, the Court concludes the Corps's issuance of the ATF Permit was not arbitrary, capricious, or contrary to law.

Accordingly, the Court **GRANTS** the Port's Cross-Motion for Partial Summary and **GRANTS** the Corps's Cross-Motion for Summary Judgment.

### B. <u>Plaintiff's APA Claim that the Corps's Verification of Boundary Change was arbitrary, capricious, and contrary to law</u>.

### 1. <u>Background</u>.

Plaintiff moves for summary judgment that the Corps's 2006

Verification of Boundary Change, which resulted in an amendment
to the Corps's findings regarding the ATF Permit, did not comply
with the requirements of the APA.  Plaintiff asserts an
additional APA challenge to the Corps's Verification of Boundary
Change decision in his CWA claim relating to the Port's
installation of culverts and tide gates, which the Court
addresses separately.

As noted, during the course of the Corps's review of the
Port's application for the ATF Permit, the Corps relied
on the 1997 Halloween Delineation regarding the reach of the
Columbia River on WHI to determine CWA jurisdiction.  In the 1997
Halloween Delineation, the Corps concluded the Ordinary High
Water Mark rather than the High Tide Line should determine the
reach of the Columbia River on WHI because the Columbia River is
nontidal there.[4]  The Corps also used the "historic" High Water
Mark rather than the "actual" High Water Mark as the demarcation
point below which disposal of dredged spoils without a § 404
permit was prohibited under the CWA.  As a result of these
determinations, the Corps concluded the Ordinary High Water Mark
at WHI was 17.3 feet NGVD.

During the period allowed for public comment on the ATF
Permit, however, Plaintiff presented information that the Port

---

[4] Judge Jones affirmed the Corps's decision, and this Court
repeatedly has declined to revisit Judge Jones's ruling.

had plugged a culvert that previously provided a hydraulic connection between the Columbia River and the upland area used by the Port for disposal purposes.  As a result, the Corps confirmed the Port disposed of dredged spoils on 20 acres of potential wetlands in addition to the 1.19 acres of wetlands previously identified.

In November 2005, the Corps issued the ATF Permit to the Port.  At the same time, the Corps issued a Public Notice soliciting comments on proposed mitigation for the additional 20 acres of potential wetlands filled by the Port without a permit. Plaintiff, the Port, and the Environmental Protection Agency (EPA) were the only parties who responded.  Plaintiff argued the proposed mitigation was inadequate and essentially reiterated the arguments he has made throughout this case regarding his perception of an appropriate jurisdictional delineation for waters of the United States and wetlands on WHI.  ATF Permit AR 239-49.  The Port argued, *inter alia,* that no mitigation was necessary because the fill was placed in an uplands area consistent with the 1997 Halloween Delineation; the Corps authorized the Port to place the fill in the affected area; and, in any event, the Ordinary High Water Mark for CWA jurisdiction on WHI should be at 12-13 feet NGVD, which is well below the location of the 20 acres filled by the Port.  ATF Permit AR at 250-83.  The EPA, however, opposed the Corps's proposed

36 - OPINION AND ORDER

mitigation plan and advised the Corps that "the proposal will not
provide suitable compensation for the permanent loss of 20 acres
of waters of the U.S."  ATF Permit AR at 284-87.

After considering the above comments, the Corps determined
the construction of federal and nonfederal dams on the lower
Columbia River resulted in a diminished flow that permanently
lowered the water levels from the Columbia River on WHI.  As a
result, the Corps also concluded United States waters would not
reach the 20 acres filled by the Port.[5]  On May 8, 2006, the Corps
issued its Verification of Boundary Change decision and found the
Columbia River dams had caused the Ordinary High Water Mark to
change from its historical level.  The Corps then issued an
Amended Department of the Army Environmental Assessment and
Statement of Findings (Amended SOF) that the Port's "disposal
area is outside the Corps' jurisdiction under the Clean Water
Act."  Accordingly, the Corps concluded there was not a need for
mitigation or for modification of the ATF Permit issued on
November 10, 2005, because "the Port did not engage in an
unauthorized discharge."  ATF Permit AR 184-86.

The Corps, supplementing its Verification of Change of
Boundary decision, found the specific location of the actual

---

[5] On May 5, 2006, the EPA withdrew its objection to the
Corps's proposed mitigation plan after it learned the Corps had
decided the Port was not required to mitigate the 20 acres it had
filled.

rather than the historic Ordinary High Water Mark on WHI was approximately 15 feet NGVD.  ATF Permit AR at 1-162.  The Port and Plaintiff each vigorously disagree with this finding:  The Port asserts the actual Ordinary High Water Mark should be 2-3 feet lower, and Plaintiff asserts it should be at least 2-3 feet higher.

Despite its objections to the Corps's revised finding, the Port acknowledges the Corps's determination was well within its discretion in light of the available evidence and the deference that must be afforded the Corps's decision under the APA.

Plaintiff, on the other hand, alleges the Corps and the Port "colluded" in the Verification of Boundary Change decision to create an "ad hoc fabrication to explain away clearly illegal behavior."  As has been his practice throughout this case, Plaintiff makes unsupported allegations of misconduct against the Corps and the Port and, as a result, refuses to accept that the Corps is entitled to substantial deference as to its agency decisions based on its expertise.  Instead Plaintiff submits his 22nd Affidavit in an effort to prove his point.

### 2.  __Plaintiff's Motion for Partial Summary Judgment (#729)__.

Although Plaintiff asserts the Corps's Verification of Boundary Change and Amended SOF are not final agency actions that are subject to judicial review, Plaintiff, nevertheless, moves for summary judgment that the Corps's supplement to the

Verification of Boundary Change decision, which reduced the elevation of the Ordinary High Water Mark from approximately 17 feet to approximately 15 feet, is arbitrary and capricious because it (1) relies on the false premise that the Columbia River is the major source of high water on WHI, (2) otherwise misinterprets the Ordinary High Water Mark, and (3) is procedurally irregular.  Throughout his often confusing arguments, Plaintiff's overarching but unsupported allegation is that the Corps and the Port are colluding with the intent of "fooling the Court."

  a. **Final Agency Action**.

   As a threshold matter, Plaintiff asserts the Corps's Verification of Change of Boundary decision is not a final agency action and, therefore, is not ripe for review under the APA. Plaintiff's assertion is at best contradictory.  It was he who asserted the claim.  If the Corps's decision is not a final agency action, Plaintiff's claim must be dismissed.  *See* 5 U.S.C. § 704.

   To be final, an agency's action "must mark the consummation of the agency's decision making process[;], it must not be of a merely tentative or interlocutory nature"; and it must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997).

39 - OPINION AND ORDER

The Corps asserts the Verification of Boundary Change decision and supporting Amended SOF are a final agency action because the decision constituted a jurisdictional determination by the Corps that the 20 acres of WHI previously filled by the Port did not include wetlands, and, therefore, a CWA permit was not required for the fill and mitigation was not required by the Port for those 20 acres.  Accordingly, the Corps finally determined the Port's obligations with regard to mitigation of the 20 acres.  In addition, the Verification of Boundary Change decision and accompanying Amended SOF are all or part of the process relating to the Corps's original agency action in issuing the ATF Permit, and, as a result, the decisions that ultimately resolved the ATF Permit issues constituted part of a final agency action.

The Court agrees with the Corps and concludes this Court has jurisdiction to review the Corps's Verification of Boundary Change decision and supporting Amended SOF because those decisions consummated the Corps's decision-making process relating to the ATF Permit and, therefore, constituted a final agency action regarding the ATF Permit process as a whole.

**b.    Determination of Ordinary High Water Mark.**

As noted, Plaintiff asserts there are numerous flaws in the Corps's determination that the Ordinary High Water Mark is now 15 feet for purposes of CWA jurisdiction on WHI.  Plaintiff

contends the Corps has misinterpreted the Ordinary High Water Mark by failing to consider that the Columbia River is not the source of high water on WHI, by changing the standard for CWA jurisdiction on WHI from the historic to the actual High Water Mark, and by encroaching on sovereign state interests during the process.

(1)  **The Columbia River**.

Plaintiff contends the Corps relied on the false premise that the Columbia River is the source of high water on WHI when, in fact, the Willamette River Freshet produces most of the high water.  In addition, Plaintiff cites recent decisions in *NWF v. NMFS*, CV 01-640-RE, a case pending in this district, for the proposition that "the tide gauge data from 2000 to 2005 was the result of an illegal prescription for Columbia River water flows that [the Honorable James A. Redden, United States District Judge,] set aside.  The recent prescription is far more likely to increase flows."  According to Plaintiff, therefore, the Corps's finding that the elevation of the actual Ordinary High Water Mark is now 15 feet NGVD because of the operation of numerous dams on the Columbia River is flawed.

Plaintiff, however, has not identified a legal or factual basis that supports his assertion that Judge Redden's decisions in *NWF v. NMFS* have caused increased flow of the Columbia River sufficient to raise the elevation of the Ordinary

High Water Mark on WHI.  In addition, the Corps's reasoning that
Columbia River dams have reduced river flow is adequately
supported by documentation in the ATF Permit AR at 1-162 and in
the August 15, 2006, explanatory memorandum authored by Corps
officials Robert Rose and James Goudzwaard in the ATF Permit AR
at 1-4.  Plaintiff essentially asks this Court to accept his
analysis supported by the materials attached to his 22nd Affidavit
and to disregard the Corps's analysis and expertise, which would,
in effect, deny the Corps the deference that its decisions are
entitled to under the APA.  The Court, therefore, rejects
Plaintiff's request.

**(2)  <u>Actual High Water Mark</u>**.

After the ATF Permit decision was made, the Corps
revisited the 1997 Halloween Delineation for purposes of
determining CWA jurisdiction on WHI.  The Corps thereafter
changed the criteria for determining the Ordinary High Water Mark
on WHI by choosing to use the "actual" High Water Mark rather
than the "historic" High Water Mark used in the 1997 Halloween
Delineation.  In the 1997 Halloween Delineation, the Corps relied
on § 10 of the Rivers and Harbors Act (RHA), 33 U.S.C. § 403,
relating to obstruction of navigable waters when it found the
historic High Water Mark was the appropriate standard for
determining the Ordinary High Water Mark on WHI.  In 2006,
however, the Corps concluded the proper standard for determining

42 - OPINION AND ORDER

CWA jurisdiction on WHI was the actual High Water Mark.  *See* 33
C.F.R. § 328.1 ("[T]he term 'waters of the United States . . .
does not apply to authorities under the Rivers and Harbors Act of
1899 except that some of the same waters may be regulated under
both statutes.").  The Corps reasoned the CWA regulation, like
the RHA, addresses navigable waters, but, unlike the RHA, the CWA
regulation does not include a provision that "an area will remain
'navigable in law' even though no longer covered by water."
Moreover, RHA regulations expressly provide the term "navigable
waters of the United States" as used in the RHA "does not apply
to the CWA."  33 C.F.R. § 329.1.

On this record, the Court concludes the Corps
adequately stated the reasons for its decision to use the actual
rather than the historic High Water Mark for determining CWA
jurisdiction on WHI.  The Corps's decision, therefore, is not
arbitrary, capricious, or contrary to law.

(3)  **State Law**.

Plaintiff asserts the Corps's decision to rely on
the actual High Water Mark to determine CWA jurisdiction on WHI
is at odds with state law.  He does not explain why and the Court
discerns no basis under the facts of this case for finding state
law is implicated in the Corps's responsibility to determine CWA
jurisdiction on WHI.

c.  **Procedural Irregularities**.

43 - OPINION AND ORDER

Plaintiff contends the Corps's Verification of Boundary Change decision and supporting Amended SOF were made without public notice or comment based on a "secret record" in violation of the APA.  Plaintiff asserts when the Corps issued the ATF Permit in October 2005, the public's ability to comment was limited to the Port's proposed mitigation plan for the 1.19 acres that the Port admitted filling without a permit.  Plaintiff contends after his comments on that subject brought to light the issue of the plugged culvert and the Corps found the Port had actually filled an additional 20 acres of WHI wetlands without a permit, the Corps and the Port colluded to change the wetlands delineation to obviate the need for further mitigation by the Port and thereby "cover[ed] the Port's illegal filling."  Thus, according to Plaintiff, the improper collusion of the Corps and the Port achieved this result without any input from the public.

The Court addressed Plaintiff's concerns regarding the lack of adequate public notice and comment when it held that it would consider materials included in Plaintiff's 22nd Affidavit even though they are not part of the Administrative Record.  The Court also notes Plaintiff reiterated some of his oft-made arguments regarding the scope of CWA jurisdiction on WHI in his comments on the Corps's proposed mitigation plan even though they were not solicited.  The Court, therefore, concludes the Corps had sufficient information to be fully aware of Plaintiff's

44 - OPINION AND ORDER

position regarding CWA jurisdiction on WHI.  Thus, any procedural
error by the Corps in not specifically requesting comments on
that subject in the December 10, 2005, Public Notice did not
prejudice Plaintiff.

On this record, the Court, having taken "due account of
the rule of prejudicial error" under the APA, finds the Corps's
procedural error in failing to give Plaintiff adequate notice and
opportunity to comment on its proposed Verification of Boundary
Change decision and Amended SOF regarding the ATF Permit was not
prejudicial to Plaintiff.  *See* 5 U.S.C. § 706.  *See also Kolek v.
Engen*, 869 F.2d 1281, 1286 (9th Cir. 1989)("Under this rule, we
reverse an agency's action for procedural errors only when these
are substantial and cause prejudice.").

Accordingly, the Court **DENIES** Plaintiff's Motion for Partial
Summary Judgment.

**3.**  **Cross-Motion for Partial Summary Judgment by the Port
(#768) and Cross-Motion for Summary Judgment by the
Corps (#849)**.

For the above reasons, the Court concludes the Corps's
Verification of Boundary Change decision and related Amended SOF
complied with the requirements of the APA.

Accordingly, the Court **GRANTS** the Corps's Cross-Motion for
Summary Judgment and **GRANTS** the Port's Cross-Motion for Partial
Summary Judgment.

45 - OPINION AND ORDER

**C.    Plaintiff's APA Claim that the Corps failed to comply with EO 11988 in the 1998SEIS, 2003CDEIS, and the ATF Permit.**

    **1.  Background.**

Plaintiff asserts the Corps did not adequately account in its 1998SEIS, 2003CDEIS, and ATF Permit for the fact that WHI lies in a floodplain and that WHI, therefore, was subject to the requirements of EO 11988[6] relating to floodplain management.[7]  The history of the Corps's issuance of the ATF Permit to the Port is set forth in Plaintiff's separate Motion challenging that action on other grounds under the APA and, therefore, is not repeated here.

    **a.   The Corps's Channel Maintenance/Improvement Projects.**

The Columbia River navigation channel was originally at a minimum depth of 20 feet.  In 1962 Congress authorized the channel to be deepened to 40 feet.  In 1975 after NEPA was enacted, the Corps prepared an Environmental Impact Statement (1975EIS) to consider the environmental impacts of ongoing and

---

[6] Although Plaintiff also refers to EO 11990, which contains a similar provision relating to new construction in wetlands, Plaintiff does not address EO 11990 in his Motion.

[7] The 1998SEIS and 2003CDEIS are separate administrative actions that the Corps combined into a single Administrative Record for purposes of review only.

future maintenance of the channel.[8]  The 1975EIS considered 152 potential dredge-disposal sites, including two on WHI.  In 1983, 1989, and 1994, the Corps prepared Environmental Assessments (EA) in which it updated its analysis of proposed dredge-disposal sites for five years (from 1994 to 1999).  The Port disposed of dredged spoils on upland sites or, according to Plaintiff, on the Wet Meadow on WHI in 1995, 1996, and 1997 pursuant to the Corps's 1994EA.  The Port has not disposed of dredged spoils on WHI since 1997.

**b.  <u>1998SEIS</u>.**

In 1998 the Corps issued the 1998SEIS as a supplement to the 1975EIS.  In the 1998SEIS, the Corps evaluated a proposed 20-year plan for the operation and maintenance of the navigation channel.  As part of the evaluation, the Corps reviewed upland disposal sites previously considered in the 1994EA.  In the 1998SEIS, the Corps determined changes in disposal practices "would have no effect on the floodplain or flood levels."[9]

**c.  <u>2003CDSEIS</u>.**

In 2003 the Corps issued a Final Supplemental

_____

[8] Although the Port did not purchase WHI from Portland General Electric until 1994, the Port has cooperated with the Corps in dredging the Columbia River since the Port's creation in 1891.  *See* Opin. and Order at 4 (issued May 3, 2002)(J. Jones).

[9] In 1999 the Corps issued a Final Integrated Feasibility Report for Channel Improvements and Environmental Impact Statement (1999CDEIS).

47 - OPINION AND ORDER

Integrated Feasibility Report for Channel Improvements and
Environmental Impact Statement (2003CDSEIS) that included,
*inter alia*, modifications to earlier dredge-disposal plans and
updated information on potential impacts of dredge disposal on
floodplains.  Specifically, the Corps found there was not a
practicable alternative to locating dredge-disposal sites in
WHI's floodplain, that the dredge disposal on WHI would have
a minimal effect on the floodplain, and that the dredge-disposal
plan conformed to the requirements of EO 11988.  *See* 2003CDSEIS
AR at 330.  In addition, the Corps found past dredge disposals
sufficiently altered the site elevation at 22 sites (including
WHI) to cause the disposal sites to be outside of the 100-year
floodplain.  2003CDEIS at C885, C890.

        **d.  ATF Permit.**

      As part of the ATF Permit process, the Corps considered
the requirements of EO 11988 and "examined potential impacts
on floodplains" because the Port's previously unpermitted fill
of 1.19 acres of wetlands had occurred "within the 100 year
floodplain."  ATF Permit AR at 302.  In a November 2005
Assessment and Statement of Finding for the ATF Permit, the Corps
noted it had studied the larger proposed impact of fill placement
on 76.5 acres of wetlands on WHI when it issued its 1987EIS for
the proposed WHI Marine Industrial Park.  The Corps concluded the
ATF Permit to fill 1.19 acres of WHI wetlands "is not expected to

adversely impact the floodplain of the Columbia River."  ATF
Permit AR at 302.

   **2.  <u>Plaintiff's Motion for Partial Summary Judgment (#719)</u>.**

        Plaintiff moves the Court to declare that the Corps failed
to comply with EO 11988 as to the 1998SEIS, the 2003CDSEIS, and
the ATF Permit.  Plaintiff asserts WHI is in a floodplain, and,
therefore, the Corps was required to give public notice of its
decision to allow the Port to dispose of dredged spoils in the
WHI floodplain on the basis that the only practicable alternative
for the Port was to dispose of dredged spoils there.[10]  Plaintiff
further asserts the Corps failed to give adequate public notice
of its decision or to make the requisite "no practicable
alternative finding" as required by EO 11988.  Accordingly,
Plaintiff contends the Corps's final agency actions in issuing
the 1998SEIS, 2003CDEIS, and ATF Permit were arbitrary,
capricious, and contrary to law in violation of the APA.

        The Corps and the Port, however, contend Plaintiff's APA
claim as to the 1998SEIS is moot because the 1998SEIS was
superseded by the 2003CDEIS.  In addition, the Corps asserts it
satisfied the procedural requirements of EO 11988 as to both the
2003CDEIS and the ATF Permit.  The Port agrees with the Corps's

_____

        [10] Plaintiff refers to the area on WHI used by the Port to
dispose of dredged spoils from 1995 to 1997 as the "Dredged
Spoils Disposal Facility."  The Port refers to the area as the
"Upland Disposal Site."

49 - OPINION AND ORDER

position, but the Port also asserts Plaintiff failed to exhaust his administrative remedies as to the 1998SEIS.

### a.   __EO 11988 generally__.

In 1977 President Carter issued EO 11988 relating to "Floodplain Management."  It requires government agencies to take steps to avoid "to the extent possible the long and short term adverse impacts associated with the occupancy and modification of floodplains."  42 Fed. Reg. 26951 (1977).

As a threshold issue, Plaintiff argues the Corps is required to comply with Engineering Regulation (ER) 1165-2-26 because it is a substantive rule imposing specific requirements regarding compliance with EO 11988 that are binding on the Corps. The Corps, joined by the Port, argues ER 1165-2-26 is merely an interpretative rule that does not have the force and effect of law, and, therefore, it is not binding on the Corps.  *See U.S. v. Alameda Gateway,* 213 F.3d 1161, 1168 (9th Cir. 2000).

In *Alameda Gateway,* the Ninth Circuit addressed the issue of when an Engineering Regulation promulgated by the Corps has the force and effect of law sufficient to bind the Corps:

> For a regulation to have the force and effect of
> law, it must:  "(1) Prescribe substantive rules-
> not interpretive rules, general statements of
> policy or rules of agency organization, procedure
> or practice-and; (2) conform to certain procedural
> requirements.  1136 (9th Cir. 1982)."

50 - OPINION AND ORDER

> For a rule to be labeled as substantive rather
> than interpretive, "the rule must be legislative
> in nature, affecting individual rights and
> obligations."

*Id.* (internal citations omitted).

When an Engineering Regulation is "merely a general policy statement to guide district engineers" as indicated by the fact that it "is not published in either the Code of Federal Regulations or Federal Register," the regulation lacks the force of law and is not binding on the Corps. *Id.* "A court will not review allegations of noncompliance with an agency statement that is not binding on an agency; a court will review only those pronouncements that actually have the force and effect of law." *Ctr. for Biological Diversity v. Brennan*, C-06-7062-SBA, 2007 WL 2408901 (N.D. Cal. Aug. 21, 2007).

Applying the court's reasoning in *Alameda Gateway,* it is clear that ER 1165-2-26 is an interpretative, nonbinding regulation. Section 1 states the "purpose of this regulation is to set forth general policy and guidance for Corps of Engineers implementation of [EO] 11988." Section 7 reflects a "[g]eneral [p]olicy" to formulate Corps projects that "avoid or minimize adverse impacts associated with the use of the base floodplain and avoid inducing development in the base flood plain unless there is no practicable alternative." Section 8 sets forth "[g]eneral [p]rocedures to be followed to implement EO 11988." Finally, ER 1165-2-26 is not published in the Code of Federal

51 - OPINION AND ORDER

Regulations or the Federal Register.

The Court agrees with the Corps that ER-1165-2-26 does not have the force and effect of law as an interpretative regulation, and, therefore, it is not binding on the Corps. Accordingly, the Corps's alleged noncompliance with ER-1165-2-26 is not subject to review.

EO 11988 provides an agency proposing "to allow an action to be located in a floodplain" must consider "adverse affects" in the floodplain.  If the agency then "finds that the only practicable alternative . . . requires siting in a floodplain, the agency, prior to taking action, shall . . . minimize potential harm to or within the floodplain."  EO 11988 § 2(a)(2).  The agency "shall also provide opportunity for early public review [of the action] in accordance with Section 2(b) of Executive Order 11514, as amended."  EO 11988 § 2(a)(4). EO 11514 § 2(b) provides the public notice "shall include . . . provision for public hearings, and shall provide the public with relevant information, including information on alternative courses of action."

Agency compliance with EO 11988 is subject to judicial review under the APA.  *City of Carmel v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997).

**b.   <u>The Corps's compliance with EO 11988 in the</u>**
      **<u>1998SEIS</u>.**

According to Plaintiff, the Corps failed to consider
the requirements of EO 11988 in the 1998SEIS.

The Corps and the Port, however, contend Plaintiff's
claim against the Corps based on the 1998SEIS is moot because the
1998SEIS was superseded in 2003 by the 2003SCDSEIS.  Moreover, in
the interim when the 1998SEIS was in effect, there was not any
alleged unlawful activity on WHI in violation of EO 11988.

The Court agrees.  The Port last disposed of dredged
spoils on WHI in 1997, which was one year before the 1998SEIS was
issued.  As noted, in 2003 the Corps issued the 2003CDSEIS, which
superseded the 1998SEIS.  Thus, even if the Corps's 1998SEIS did
not comply with the provisions of EO 11988, neither the Corps nor
the Port engaged in any activity under the auspices of the
1998SEIS that would have required compliance with EO 11988.  In
other words, an actual controversy did not arise under the
1998SEIS before it was superseded.  *See Cook Inlet Treaty Tribes
v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999)("An action is moot
if no actual or live controversy exists, for example, when we
cannot grant effective relief.").

Accordingly, the Court concludes Plaintiff's APA claim
regarding the 1998SEIS is moot.

c.    __The Corps's compliance with EO 11988 in the__
__2003CDSEIS__.

Plaintiff moves the Court to declare that the Port's
dredge-disposal site on WHI continues to lie in a floodplain and
that the Corps's finding of "no practicable alternative" and its
public notice as to that finding in the 2003CDSEIS were
inadequate.

(1)  __WHI is in a floodplain__.

A predicate to Plaintiff's claim is that WHI lies
in a floodplain.  The Corps does not dispute it considered WHI to
be in the 100-year floodplain until 2003 when it issued the
2003CDEIS.  The Corps and the Port, however, now assert their
earlier determination has been revised because the Port's
placement of dredged spoils on WHI in 1997 raised the elevation
sufficiently to remove WHI from the 100-year floodplain.  In any
event, the record reflects the Corps continued to consider the
dredge-disposal site used by the Port on WHI to be within the
100-year floodplain in its November 2005 Assessment and Statement
of Finding for the ATF Permit.  Moreover, no action has been
taken to have WHI removed from Federal Emergency Management
Agency (FEMA) maps as a floodplain even though there is some
indication that the Corps intends to do so.  _See_ Port's Response
to Pl.'s Concise Statement of Material Facts at ¶ 6 ("The Corps
stated an intention to send Letters of Map Revision (LOMR) to

FEMA to indicate changes of floodplain status on WHI.").

On this record and for purposes of these Motions, the Court concludes the Port's dredged-spoils disposal sites were within the floodplain on WHI at all material times for purposes of reviewing whether the Corps adequately considered the requirements of EO 11988 in the 2003CDSEIS.

(2) **Adequacy of Public Notice**.

Plaintiff contends the Corps "[has] never issued a public notice that announced a site-specific finding that no practicable alternative to the proposed [dredge-disposal] action exists for actions on [WHI]."

The Corps asserts it was guided by the EPA in its evaluation of the proposed action as a whole and in its preparation of the 2003CDSEIS. Accordingly, the Corps disputes Plaintiff's contention that no public notice was given and asserts it provided public notice as required under NEPA. The Corps maintains it circulated several hundred copies of the 2003CDSEIS and a public notice of availability of the 2003CDSEIS was published in the Federal Register. 2003CDSEIS AR Ex. 5 at C93-111. The Corps also points out that the public was given an opportunity to comment on the 2003CDSEIS before the Corps adopted the Record of Decision for that EIS. 2003CDEIS AR at Ex. 4.

Section 2(a)(1) of EO 11988 requires evaluation of the impacts of projects on floodplains as part of the NEPA

55 - OPINION AND ORDER

process:  "Before taking an action, each agency shall determine
whether the proposed action will occur in a floodplain-for
major Federal actions significantly affecting the quality of
the human environment, the evaluation required below will be
included in any statement prepared under Section 102(2)© of
the National Environmental Policy Act."  *Accord No Oilport! v.
Carter*, 520 F. Supp. 334, 368 (W.D. Wa. 1981)("E.O. 11988
contemplates that the impact of projects on floodplains be
evaluated as part of the NEPA process.").

On this record, the Court concludes the Corps met
the public-notice requirements of EO 11988 by circulating its
findings for the 2003CDSEIS as part of the NEPA process.

### (3)  **"No practicable alternative" finding**.

Plaintiff contends neither the 2003CDSEIS nor the
ATF Permit contained sufficient findings to establish that the
Corps had "no practicable alternative" to allowing the Port to
dispose of dredged spoils in the WHI floodplain.[11]

As noted, the Corps specifically found there were
"no practicable alternatives" to the selected site, that the
dredge disposal would have "minimal effect on the floodplain and

---

[11] In his Reply, Plaintiff for the first time asserts the
Corps failed to comply with EO 11988 in its April 2004 Finding
of No Significant Impact in the 1994 EA.  Plaintiff's claim,
however, is time-barred.  *See* Opin. and Order at 15 (issued Sept.
27, 2004)(any claim for an APA violation arising from actions
occurring before December 29, 2004, is time-barred).

flood levels," and that it "conform[ed] to the requirements of
[EO 11988]."  2006 AR Ex. 6 at C330, C883-911.  The Corps
supported its finding with a "Floodplain Evaluation Report" in
which the Corps identified disposal sites and concluded moving
dredged spoils outside of the floodplain "would be impracticable
due to distance, logistics, physical (geography) and economical
constraints."  2006 AR Ex. 6 at C889.

On this record, the Court concludes the Corps
adequately addressed floodplain issues in the 2003CDSEIS and the
Corps's "no practicable alternative" finding in the 2003CDSEIS is
adequately supported in the record.  Accordingly, the 2003CDSEIS
meets the requirements of EO 11988.

**d.    The Corps's compliance with EO 11988 in the
ATF Permit**.

Plaintiff contends the Corps did not comply with EO
11988 when the Corps issued the ATF Permit.

The Corps found there would not be an adverse impact
on floodplain management by the issuance of the ATF Permit.
ATF Permit AR at 302.  The Corps also found other sites for
disposal of dredged material were not available and that a "no
action alternative" was not "a practicable alternative."  ATF
Permit AR at 304.  In addition, the Corps sent a public notice in
February 2005 directly to Plaintiff and others inviting comments
on the Port's ATF Permit application and advising the Corps's

decision would be based on a number of factors including "flood hazards [and] floodplain values."  ATF Permit AR at 472-73.

When the Court accords the Corps the deference to which it is entitled under the APA, the Court concludes the record reflects the Corps adequately considered floodplain management on WHI before issuing the ATF Permit and thereby met its obligations under EO 11988.

For these reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment that the Corps's 1998SEIS, 2003CDEIS, and ATF Permit failed to comply with EO 11988.

    **3.**    **Motion for Partial Summary Judgment of the Port (#767) and Cross-Motion for Summary Judgment of the Corps (#824).**

For these same reasons, the Court **GRANTS** the Port's Motion for Partial Summary Judgment and **GRANTS** the Corps's Cross-Motion for Summary Judgment that (1) Plaintiff's APA claim against the Corps's 1998SEIS for noncompliance with EO 11988 is moot and (2) the Corps's 2003CDSEIS and ATF Permit complied with the requirements of EO 11988 and, therefore, the Corps did not violate the APA.

**D.**   **Plaintiff's NEPA Claim that the Corps failed to comply with NEPA in the 1998SEIS, 2003CDEIS, and ATF Permit.**

In addition to challenging the Corps's 1998SEIS, 2003CDEIS, and ATF Permit under the APA, Plaintiff contends the Corps failed to assess the environmental impacts of these final agency actions

58 - OPINION AND ORDER

as required under NEPA.

1. **Background**.

The background information set forth under Plaintiff's
APA claim as to these final agency actions also applies to
Plaintiff's NEPA claim also and need not be repeated here.

2. **Plaintiff's Motion for Summary Judgment (#716)**.

Plaintiff moves the Court to declare that the Corps violated
NEPA when it (1) failed to prepare an EIS or SEIS or to consider
alternatives before allowing the Port to build the so-called
"Dredged Spoils Disposal Facility Project" on WHI; (2) failed to
prepare an "equivalent site-specific EIS or SEIS in the 1998SEIS
and 2003CDSEIS or consider alternatives to the Disposal Site in
[the Corps's] respective 404(b) review"; (3) failed to prepare
"the necessary EIS or SEIS or consider alternatives to the
Disposal Site in the ATF Permit"; and (4) failed to meet the
requirement of preparing a separate site-specific EIS for the ATF
Permit, the 1998SEIS, and the 2003CDSEIS.

a. **The Corps's consideration of alternatives for the
Port's Dredged Spoils Disposal Facility**.

Plaintiff moves the Court to declare that the Corps
failed to prepare an EIS or SEIS as required by NEPA before
allowing the Port to build its Dredged Spoils Disposal Facility
on WHI in preparation for the disposal of dredged spoils from the

Columbia from 1995-97.  The Corps, however, considered the environmental impacts of the Port's future dredge-disposal operations on WHI and issued a Finding of No Significant Impact (FONSI) in its 1994 Environmental Assessment (1994EA).  Even if Plaintiff's NEPA claim could be broadly construed to challenge the 1994EA, this Court has previously ruled that such a claim would be time-barred.  *See* Opin. and Order at 15 (issued Sept. 17, 2004)(claims based on the Corps's agency actions occurring before December 29, 1994, are time-barred).

Accordingly, the Court concludes Plaintiff is not entitled to a declaration that the Corps failed to prepare an EIS/SEIS before permitting the Port to disposed of dredged spoils on WHI.

b.   **The Corps's decision not to prepare an equivalent site-specific EIS or SEIS as part of the 1998SEIS and 2003CDSEIS Review or to consider alternatives to the Disposal Site in the Corps's 404(b) Review**.

Plaintiff moves the Court to declare that the Corps violated NEPA when it did not include an evaluation in the 1998SEIS and 2003CDSEIS of the cumulative effects of the Port's disposal practices at the Dredged Spoils Disposal Facility on WHI.  Plaintiff asserts "[t]he 1998 SEIS and 2003 CDSEIS are inadequate in disclosing what site-specific impacts had occurred, what site-specific future impacts could occur and what reasonable range of site-specific alternatives were considered."  Pl.'s Mem.

at 23-24.  He also asserts the Corps did not adequately assess
the impact of nor consider the alternatives to the Dredged Spoils
Disposal Facility on WHI as required by § 404(b) of the CWA,
33 U.S.C. 1344(b).

> ### (1)  **1998SEIS**.

As with Plaintiff's challenge based on EO 11988,
the Court cannot grant effective relief under NEPA because the
Port's disposal of dredged material on WHI occurred before the
1998SEIS was issued and any future disposal will be subject to
the 2003CDSEIS, which superseded the 1998SEIS.  Thus, Plaintiff's
claim as to the 1998SEIS is moot.

> ### (2)  **2003CDSEIS**.

Plaintiff contends NEPA required the Corps to
conduct a site-specific review of the impact of the Corps's past
actions that resulted in the "illegal creation of the [Port's]
WHI Dredged Spoils Disposal Facility" in the 2003CDSEIS.

The Corps and the Port assert the 2003CDSEIS
evaluated the Channel Improvement Project as a whole and did not
require a separate analysis of the cumulative impact of each and
every previous disposal of dredged spoils at each and every
disposal site.  The Corps also contends such a requirement would
be "completely unmanageable" and, therefore, would extend "far
beyond what is required by NEPA's 'rule of reason.'"  In *Center
for Biological Diversity v. U.S. Forest Service*, the court noted:

61 - OPINION AND ORDER

> We employ a rule of reason [standard] to
> determine whether the [EIS] contains a
> 'reasonably thorough discussion of the
> significant aspects of the probable
> environmental consequences.'" *Under this*
> *standard, which is essentially applied in the*
> *same manner as the arbitrary and capricious*
> *standard, review consists only of ensuring*
> *that the agency has taken a hard look at the*
> *environmental effects of the proposed action.*

349 F.3d 1157, 1166 (9th Cir. 2003)(internal citations omitted)

(emphasis added).

The Corps asserts it took the requisite hard look

at the cumulative impact of the dredge-disposal program in its

environmental reviews of the overall channel-maintenance and

channel-improvement projects analyzed in the 1999CDEIS (which is

not under review here) and the 2003CDSEIS.

In each EIS, the Corps prepared a cumulative-

effects analysis that addressed the 82 upland dredge-disposal

sites (including WHI) used for 20 years.  2006 AR Ex. 25 at

C3254-C3257 (1999CDEIS); 2006 AR Ex. 6 at C135 and C288-C323

(2003SEIS).  In its analysis, the Corps concluded there were

impacts to 892 acres out of a total of 2,696 acres of

riparian/wetland habitat with most impacts at the Port of Kalama

and smaller impacts spread throughout the disposal sites.  2006

AR Ex. 25 at C3255.  The Corps estimated future wetland habitat

losses at 20-28 acres compared to an estimated 52,000 acres of

marsh wetland and 27,000 acres of forested wetland that were lost

62 - OPINION AND ORDER

from the 1880s to 1991.  2006 AR Ex. 25 at C3257.

The Corps asserts its analysis of the cumulative effects of past dredge-disposal actions in the 2003SEIS, which incorporated the analysis in the 1999CDEIS, met the guidelines promulgated by the Council of Environmental Quality (CEQ).  The CEQ was established to implement and to monitor compliance with NEPA.  42 U.S.C. § 4344.  "CEQ regulations . . ., promulgated with the purpose [of] tell[ing] federal agencies what they must do to comply with [NEPA] procedures and achieve the goals of [NEPA], 'have been interpreted by the Supreme Court as entitled to substantial deference.'"  *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016 (9th Cir. 2006)(internal citations omitted).

CEQ Guidelines provide "agenc[ies] are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined."  *See Memorandum - Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* at 2 (issued June 24, 2005).  "Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions *without delving into the historical details of individual past actions*."  *Id.* (emphasis added).  Moreover, agencies "may properly limit the scope of their cumulative effects analysis based on

63 - OPINION AND ORDER

practicable considerations."  *Id.*

On this record, the Court concludes the Corps's combined cumulative-effect analyses in the 1999CDEIS and the 2003CDSEIS constitute the "hard look" required by NEPA and, therefore, satisfied the CEQ Guidelines.  Thus, Plaintiff has not offered any reasonable rationale to support his proposition that the Corps was required in the 1999CDEIS and the 2003CDSEIS to engage in a site-specific review of the effects of the Port's disposal of dredged spoils on WHI between 1995 and 1997 in order to accomplish the "hard look" required by NEPA.

### (3)  CWA § 404(b) Review.

Plaintiff contends the Corps was required to analyze the impact of and consider alternatives to the use of WHI as a dredge-disposal site in the 2003CDSEIS under § 404(b) of the CWA, 33 U.S.C. § 1344(b).

The Corps responds its actions allowing the Port to dispose of dredged spoils on WHI contemplated disposal into uplands on WHI rather than into waters of the United States or wetlands.  In addition, the Corps notes the only disposal of dredged spoils into wetlands on WHI was addressed in the Corps's issuance of the ATF Permit to the Port.  Accordingly, the Corps contends the provisions of § 404(b) do not apply here.

Plaintiff, however, asserts WHI has been designated as a "Special Aquatic Area of national importance,"

64 - OPINION AND ORDER

which requires the Corps to conduct an "elevated" § 404(b)(1) CWA
Permit evaluation to determine whether alternative sites are
available for the disposal of dredged spoils.  Plaintiff

apparently considers WHI as a whole to be a "Special Aquatic
Area" for purposes of § 404(b).

            The Court agrees with the Corps that § 404(b) does
not apply to the Corps's decision to use upland areas of WHI as a
dredged-spoils disposal site.  Section 404(a) of the CWA allows
the Corps to issue a permit for the disposal of "dredged or fill
material *into the navigable waters* at specified disposal sites"
(emphasis added).  Pursuant to § 404(b)(1) and (2), the Corps
must perform a "public interest review" of the impacts of such
permitted disposals.  *See* 33 C.F.R. § 320.4 (a)(1)("The decision
whether to issue a permit will be based on an evaluation of the
probable impacts, including cumulative impacts, of the proposed
activity and its intended use on the public interest.").

            A 1992 Memorandum of Agreement between the EPA and
the Corps sets out CWA permit procedures that should be followed
if dredged fill materials are to be disposed of in "aquatic
resources of national importance."  Such aquatic resources are
identified in 30 C.F.R. § 230.40-45 to include:

                    a.   sanctuaries and refuges - for the
                         preservation and use of fish and
                         wildlife (§ 230.40),

b.  wetlands - inundated or saturated by
    surface or ground water (§ 230.41),

c.  mudflats - broad flat areas along
    the sea coast, and in coastal rivers
    to the head of tidal influence and
    in inland lakes, ponds, and riverine
    systems (§ 230.42),

d.  vegetated shallows - permanently
    inundated areas (§ 230.43),

e.  coral reefs (§ 230.44), and

f.  riffle and pool complexes - stream
    sections (§ 230.45).

In this case, the EPA, as part of its review of

the Corps's proposed ATF Permit, gave the Corps notice that it

was considering elevation of the ATF Permit decision as it

related to the proposed mitigation of the 20 acres of alleged

United States waters on WHI filled by the Port.  *See* ATF Permit

AR at 284.  The EPA withdrew the notice after the Corps concluded

the 20 acres were not waters of the United States.  ATF Permit AR

at 187.

The designation of a "Special Aquatic Area" does

not in and of itself broaden the scope of the CWA's permit

requirements under § 404(b) unless the area within the Special

Aquatic Area constitutes waters of the United States or falls

within one of the definitions set out above.  In this case, the

Port's upland sites on which dredged spoils were disposed are not

"waters of the United States" and, with the exception of 1.19

acres of wetlands that were the subject of the ATF Permit, do

66 - OPINION AND ORDER

not include the features described above that are necessary to constitute "aquatic resources of national importance."

Accordingly, the Court concludes the Corps was not required to perform a § 404(b) review or to locate alternative sites for the Port's disposal of dredged spoils based on WHI's designation as a Special Aquatic Area of national importance.

**c.    The Corps's decision not to prepare an EIS or SEIS or to consider alternatives to the Disposal Site in the ATF Permit.**

Plaintiff contends the Corps was required to prepare a full-blown EIS or SEIS before granting the ATF Permit to the Port under § 404(b)(1) of the CWA.  Although Plaintiff asserts the Corps's ATF Permit review should have triggered a complete environmental review of the Port's use of WHI as a dredged-spoils disposal site, this is simply a variation on the already rejected theory that NEPA required the Corps to perform site-specific EAs of each dredge-disposal site in the 1999CDEIS and 2003SEIS.

Plaintiff also contends the limited environmental review performed by the Corps was inadequate because it failed to consider either alternative sites for the Port's dredge disposal or a "no action alternative" that would have precluded any dredge disposal on WHI.  He contends "[n]ot dredging at all in the vicinity of WHI is the true no action alternative."

The Corps responds its 2005EA sufficiently addressed

the impact on the 1.19 acres of WHI that the Port inadvertently filled and that was the object of the ATF Permit process and reflected an adequate consideration of a reasonable range of alternatives. ATF Permit AR at 297-315. The Corps did not have any intention of replicating the 1994EA in which it considered the environmental impact of proposed dredged disposals on WHI as a whole.

### (1)  **Scope of Review.**

The scope of a NEPA environmental review is determined by "the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practicable considerations of feasibility. Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the [Corps]." *Kleppe v. Sierra Club,* 427 U.S. 390, 411 (1976). "Absent a showing of arbitrary action, [the Court] must assume that the [Corps has] exercised this discretion appropriately." *Id.*

### (2)  **Adequacy of 2005EA.**

The Corps asserts the 2005EA adequately considered practicable alternatives to the dredge disposal on the 1.19 acres of wetlands on WHI that were inadvertently filled by the Port. In addition, the Corps provided for compensatory mitigation to offset the loss of those wetlands by requiring the Port to create two acres of palustrine forested and scrub-shrub wetlands

adjacent to existing wetlands.  ATF AR at 311-14.

### (a)  **Practicable Alternatives**.

The Corps must consider "practicable
alternatives" in the § 404(b)(1) permit process that would
include potential dredge disposal at other sites and would not
involve disposal into waters of the United States.  40 C.F.R.
§ 230.10 (A)(I) and (ii).  The alternatives to be considered are
determined by the nature and scope of the proposed project.
*Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d
1520, 1538 (9th Cir. 1997)(agency must look at reasonable
alternatives "within the range dictated by the nature and scope
of the proposed action.").  An agency's failure to examine a
viable alternative renders the EA inadequate.  *Muckleshoot Indian
Tribe v. U.S.F.S.*, 177 F.3d 800, 814 (9th Cir. 1999).  "The range
of alternatives that must be considered need not extend beyond
those reasonably related to the purposes of the project." *Trout
Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir. 1974).  The
Corps may take into consideration the cost, technology, and
logistics of the proposed alternative when determining whether it
is practicable.  40 C.F.R. § 230.10(a)(2).

The purpose and need for the proposed
discharge of dredged spoils on WHI "is to maintain an upland
disposal site, which is needed for the placement of dredged
material from the improvement and routine maintenance of the

Columbia River navigation channel."  ATF Permit AR § 3.5 at 299.
The record reflects the Corps analyzed alternative sites but
rejected them as impracticable:  For example, the Suttle Road
Rehandle Facility was too small and lacked the capacity to meet
the Port's dredge-disposal needs on WHI, the Rivergate site was
no longer in use, and the upland disposal site at the Port of
Vancouver was too small.  ATF Permit AR §§ 5.3 and 5.4 at 304.

**(b)  No Action Alternative.**

The Corps concluded not taking any action to
permit dredge disposal on WHI was impracticable because it would
not have met the project's purpose, which, specifically, was to
maintain an upland dredge-disposal facility on WHI.

On this record, the Court finds the Corps's
2005EA met the requirements of NEPA because it included
consideration of practicable alternatives for the dredge disposal
on WHI and an analysis of the impact of the Corps's issuance of
an ATF Permit to the Port arising from the Port's inadvertent
fill of 1.19 acres of wetlands on WHI in 1996.

    **d.**  **Plaintiff's contention that the ATF Permit,
1998SEIS, and 2003CDSEIS do not meet the NEPA
requirement of a site-specific EIS.**

Plaintiff moves the Court for a declaration that appears
to consolidate and to summarize his position in support
of his Motion as to the preceding three arguments.  The Court
denies Plaintiff's request for the reasons stated above.

For these reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment that the Corps's 1998SEIS, 2003CDEIS, and ATF Permit failed to comply with NEPA.

### 3. The Port's Motion for Partial Summary Judgment (#767) and the Corps's Cross-Motion for Summary Judgment (#824).

For the reasons stated above, the Court **GRANTS** the Port's Motion for Partial Summary Judgment and **GRANTS** the Corps's Cross-Motion for Summary Judgment that Plaintiff's claim against the Corps's 1998SEIS for noncompliance with NEPA is moot and the Corps's 2003CDSEIS and ATF Permit complied with NEPA.

### E. Plaintiff's CWA Claim that the Port did not have a CWA Permit when it used dredged spoils to build a containment dike on WHI in 1997 and filled the Wet Meadow from 1995-97.

#### 1. Background.

Plaintiff previously moved for summary judgment on these claims. The Court, however, deferred ruling on Plaintiff's Motion pending a decision by the Corps on the Port's ATF Permit application, which was then under review. *See* Opin. and Order at 68-72 (issued Sept. 9, 2005).

#### 2. Plaintiff's Motion for Partial Summary Judgment (#700).

Plaintiff moves for summary judgment that the Port did not have a CWA permit when it used dredged spoils to build a containment dike on WHI in 1997 and, as a result, filled at least 20 acres of wetlands in the Wet Meadow from 1995-97. The Port

71 - OPINION AND ORDER

concedes and the Corps confirms the Port inadvertently filled 1.19 acres of wetlands on WHI without a § 404 CWA permit.

The Corps issued the ATF Permit to the Port in November 2005.  It required the Port to provide mitigation to make up for the 1.19 acres of wetlands that it inadvertently filled with dredged spoils.  The Port concedes it is responsible for the required mitigation.

The Corps also concluded in its subsequent Verification of Boundary Change decision and Amended SOF that the Port did not fill an additional 20 acres of United States waters on WHI:

> [I]t is clear the post-dam construction ordinary high water mark and the extent of the Corps's non-wetlands § 404 jurisdiction, is below the elevation necessary to allow river waters to reach the disposal area. Accordingly, available evidence clearly shows that the disposal area is outside the Corps' jurisdiction under the Clean Water Act. . . .
>
> This conclusion is further supported by review of aerial photography over the last 70 years.  The aerial photos show that through-out this time frame the area where the disposal area is now located was used for agriculture and cattle grazing.

ATF Permit AR at 186.

The Court has found the Corps's final agency actions in issuing the ATF Permit, Verification of Boundary Change, and Amended SOF were not arbitrary, capricious, or contrary to law, and, therefore, those actions complied with the APA. Accordingly, the Court concludes on this record that the Corps's

72 - OPINION AND ORDER

issuance of the ATF Permit renders Plaintiff's claim moot as to the 1.19 acres filled by the Port.

For these reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment that the Port did not have a CWA Permit when it used dredged spoils to build a containment dike on WHI in 1997 and filled the Wet Meadow from 1995-97.

### 3. <u>The Port's Cross-Motion for Partial Summary Judgment (#752)</u>.

For these reasons, the Court **DENIES as moot** the Port's Cross-Motion for Partial Summary Judgment as to Plaintiff's claim that the Port filled 1.19 acres of wetlands on WHI without a CWA Permit and **GRANTS** the Port's Cross-Motion for Partial Summary Judgment that the Port did not fill an additional 20 acres of waters of the United States on WHI without a CWA § 404 Permit.

### F. <u>Plaintiff's CWA/APA Claim that the Port unlawfully raised an existing road from below the Ordinary High Water Mark with rubble and installed tide gates and culvert extensions</u>.

### 1. <u>Background</u>.[12]

In 1996 the Port performed maintenance repairs to an existing dirt road that runs roughly parallel to the north

---

[12] This claim involves the CWA and an APA issue. The background facts as to the CWA claim are derived primarily from the parties' Concise Statements of Material Facts that are undisputed or conceded either by agreement or by the failure to comply with the requirements of Local Rule 56.1(a) and (b). The background facts regarding the APA issue are derived from the ATF Permit Administrative Record and the Corps's Verification of Boundary Change decision.

shoreline along Benson Pond on WHI.  As part of the repairs, the
Port installed culvert extensions with attached tide gates to
existing culverts for the purpose of preventing river debris from

damaging the culverts.  The tide gates were removed in 2000.  The
Port did not have a § 404(a) Permit for these activities.

**2.   Plaintiff's Motion for Partial Summary Judgment (#704).**

Plaintiff contends the Port was required to obtain a § 404
CWA Permit before installing the tide gates and culvert exten-
sions on WHI.  Plaintiff again moves the Court to declare
(1) the installation of the tide gates and culverts restricted
the flow and reach of the Columbia River into WHI; (2) the
installations constitute an unlawful discharge of a pollutant
without a § 301 CWA permit; (3) the Port was required to comply
with the requirements of § 401(a) of the CWA by obtaining a §
404(a) permit because the Port's tide gates and culvert
installations restricted the flow of the Columbia River, and,
therefore, the CWA still governed; and (4) the Corps's failure to
consider the impact of the tide gates and culvert extensions as
factors limiting the reach and flow of the Columbia River on WHI
renders the Corps's Permanent Change of Boundary decision
unlawful under the APA.

**a.   The effect, if any, of the installed tide gates and
culvert extensions on the flow and reach of the
Columbia River into the interior of WHI.**

Plaintiff moves the Court to declare that CWA jurisdiction extends to that area on WHI that was subject to the reach and flow of the Columbia River before installation of the tide gates and culverts.  Plaintiff cites to a 1997 memorandum authored by W.B. Paynter, the Corps's Chief, Regulatory Branch, in which he states:

> Historically, [the area where the tide gates were installed] received water from the Columbia River via open culverts located at the end of a neck at the extreme western portion of the site.  *These open culverts were replaced in 1996 with tidegated culverts, which have reduced the reach of waters to the interior Area [of WHI]*.  We still consider the interior Area to be part of the navigable waters of the United States subject to regulation under both 10 and 404.

Pl.'s 19th Aff., App. 1 at 3 (emphasis added).

Plaintiff asserts Paynter's memorandum was part of the Administrative Record for the 1997 Halloween Delineation. *See* Halloween Delineation AR at 1-3.  Plaintiff also points out that Judge Jones upheld the 1997 Halloween Delineation. *See* Opin. and Order at 22 (issued Mar. 19, 2004)("[T]he wetlands delineation represents a reasoned decision based on relevant and appropriate factors.").  Plaintiff argues, *ipso facto,* that Judge Jones's decision compels this Court to accept that the tide gates restricted the flow of the Columbia River on WHI.

The Port, however, contends the road where the maintenance was performed and the culvert extensions/tide gates

75 - OPINION AND ORDER

were installed was in an area located at 20 feet NGVD, which is well above the Ordinary High Water Mark established at 17.3 feet NGVD by the 1997 Halloween Delineation.  According to James Laubenthal, the Port's Manager for Transportation and Land Use Planning who has been directly involved with the Port's activities on WHI, the tide gate and culvert installations did not impact waters of the United States, and, therefore, the Port's maintenance activities were not subject to CWA jurisdiction.  *See* Laubenthal Supplemental Decl. ¶¶ 11-15.

The Court notes Laubenthal modified Exhibit 1 to his Declaration, which purports to reflect the Ordinary High Water Mark on WHI, by marking the Exhibit as Plaintiff has marked many of his exhibits.  The Court, however, rejects Exhibit 1 as modified for the same reasons it has rejected every exhibit presented by Plaintiff that has been similarly modified.

Even though Judge Jones did not specifically address whether the installation of the tide gates and culvert extensions impacted United States waters, he accepted Paynter's conclusions by implication when he upheld the Corps's wetlands delineation on WHI based in part on those conclusions.  The Court, therefore, will not revisit Judge Jones's decision.

Accordingly, the Court concludes the installation of the tide gates and culvert extensions by the Port restricted the flow and reach of the Columbia River into WHI.

76 - OPINION AND ORDER

**b.**    **Plaintiff's contention that the installations**
**constitute an unlawful discharge of a pollutant**
**without a CWA § 404 Permit**.

Plaintiff moves the Court to declare that the Port
should have obtained a CWA § 404 Permit before installing the
tide gates and culvert extensions because the installations
constituted the placement of a pollutant in United States Waters.
*See* 33 U.S.C. §§ 1311, 1341(a), 1344(a).  The Port, however,
asserts the tide gates and culvert extensions installed on WHI
were not "pollutants" within the meaning of the CWA.

The CWA prohibits "the discharge of any pollutant"
into United States waters without a § 301 Permit.  33 U.S.C.
§ 1311(a).  The CWA defines "pollutant" as

> dredged spoil, solid waste, incinerator
> residue, sewage, garbage, sewage sludge,
> munitions, chemical wastes, biological
> materials, radioactive materials, heat,
> wrecked or discarded equipment, rock, sand,
> cellar dirt, and industrial, municipal, and
> agricultural waste discharged into water.

33 U.S.C. § 1362(6).

In *Leslie Salt Co. v. United States*, the court found
"side-casting and redeposit of excavated wetlands, and the
pouring of concrete [during the installation of a tide-gate]
would constitute the discharge of a pollutant under the CWA."
820 F. Supp. 478, 481 (N.D. Cal. 1992).  The court, however, did
not find the installation of tide gates and culverts constitutes
the discharge of pollutants *per se* under the CWA.

The Port contends there is not any evidence that it used materials defined as pollutants under the CWA (*e.g.,* dredged materials) when it installed the tide gates and culvert extensions.  The Court agrees.  The Port submitted unrebutted evidence that "[t]he tide gates were bolted to culvert extensions, which were then installed on the ends of the pre-existing metal culverts."  Laubenthal Supplemental Decl. ¶ 18. Although the Port may have used "fill material" when the tide gates and culvert extensions were installed,[13] there is not any evidence in the record that the installed materials included "pollutants."

> **c.   Plaintiff's contention that the Port was required to obtain a CWA § 404(a) Permit before installing the tide gates and culvert extensions.**

Plaintiff moves the Court to declare that the Port was required to obtain a CWA § 404(a) Permit before installing the tide gates and culvert extensions because the installation restricted the flow of United States waters on WHI.  The Port, however, argues it is not liable for failing to obtain a CWA Permit because it removed the tide gates before this action was filed.  Accordingly, assuming *arguendo* the installation was in violation of the CWA, the Port contends the violation was a "wholly-past" violation over which this Court lacks jurisdiction.

---

[13] "Fill material" includes "materials used to create any structure or infrastructure in the waters of the United States." 33 C.F.R. § 323.2.

*See Headwaters, Inc. v. Talent Irrigation Dist.,* 243 F.3d 526, 529 (9th Cir. 2001)(under the citizen-suit provisions of the CWA, 33 U.S.C. § 1365(a), a court lacks jurisdiction to review "wholly past" violations).

The Court disagrees. Although the Port removed the tide gates before Plaintiff filed this action, there is not any evidence in the record that the Port also removed the culvert extensions that were installed at the same time. "[A] citizen plaintiff may prove ongoing [CWA] violations . . . by proving violations that continue on or after the date the complaint is filed." *Sierra Club v. Union Oil Co. of Cal.,* 853 F.2d 667, 671 (9th Cir. 1988). The Court, however, also notes there is not any evidence in the record as to whether the culvert extensions without the tide gates attached sufficiently restricted the flow of United States waters on WHI to require a CWA § 404(a) Permit.

Accordingly, the Court concludes genuine issues of material fact exist as to whether the Port violated the CWA by failing to obtain a CWA § 404(a) Permit before installing the culvert extensions and whether such violation, if any, continued after Plaintiff filed his Complaint in 2000.

     d. **Plaintiff's contention that the Corps's Verification of Boundary Change decision was arbitrary, capricious, and contrary to law because the Corps failed to consider the tide gates and culverts as factors limiting the reach and flow of the Columbia River on WHI.**

Plaintiff contends the Corps should not have issued its

Verification of Boundary Change decision altering the Ordinary High Water Mark on WHI without first considering the impact of the tide gates and culvert extensions on the reach and flow of the Columbia River into WHI.

As noted, in its Verification of Boundary Change decision, the Corps rejected the former "historic" Ordinary High Water Mark as the determinant for CWA jurisdiction on WHI in favor of the "actual" Ordinary High Water Mark based on the impact of federal dams on the Columbia River. The Corps's decision also was based in part on field visits to WHI by Corps survey teams in May, July, and August 2006 and an evaluation of "historic gauge data" on daily maximum Columbia River surface elevations from 1972 through mid-1976. ATF Permit AR 1-4. The field visits confirmed the Corps's opinion that jurisdictional boundaries for CWA jurisdiction on WHI should be based on "the permanent changes in flows resulting from the presence of Columbia River dams." ATF Permit AR 1-4. The Court has already upheld this decision by the Corps.

On this record, the Court is satisfied that the ATF Permit Administrative Record as a whole supports the Corps's determination of the jurisdictional limits of the CWA on WHI based on actual conditions existing in 2006. There is not any evidence that the Port's installation of tide gates and culvert extensions and the subsequent removal of the tide gates would

80 - OPINION AND ORDER

have or should have had any bearing on the Corps's decision.

For these reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment that the Corps's Verification of Boundary Change decision was unlawful under the CWA and the APA.

###    3.    **The Port's Cross-Motion for Partial Summary Judgment (#753).**

For the reasons stated above, the Court concludes the Port is entitled to partial summary judgment that the Court lacks jurisdiction to determine whether the Port's installation of tide gates on WHI without a permit violated Section 404(a) of the CWA and the APA.  The Court, however, also concludes genuine issues of material fact exist that preclude partial summary judgment in favor of the Port as to Plaintiff's claim that the Port violated the CWA when it installed culvert extensions on WHI without a § 404(a) Permit.  Accordingly, the Court **GRANTS in part** and **DENIES in part** the Port's Cross-Motion for Partial Summary Judgment.

## G.    **Plaintiff's CWA Claim that the City unlawfully filled a wetland on Lot 100 adjacent to Canoe Bay on WHI.**

###    1.    **Background.**

In 1999 the City laid a sewer line in a trench dug through Lot 100 of WHI, an area immediately east of the Burlington Northern Railroad tracks.  Plaintiff contends the area included the "Canoe Bay wetland."  He further contends the City did not have a CWA permit for laying the sewer pipeline, and it resulted

81 - OPINION AND ORDER

in the destruction of "part or all" of the Canoe Bay wetland in violation of § 301(a) of the CWA.

According to the City, however, it obtained Permit 97-1482 from the Corps, which authorized the fill of approximately 2800 square feet of wetlands on WHI as part of the sewer-pipeline project. The City, nevertheless, concedes it inadvertently filled an additional 1813 square feet of wetlands on WHI for which a mitigation plan has been submitted to the Corps for review.

    2.   **Plaintiff's Motion for Summary Judgment (#708) and City's Cross-Motion for Summary Judgment (#766)**.

Plaintiff presented evidence primarily through the First Affidavit of geologist Clive Kienle, Jr., that soils disrupted during the City's excavation of Lot 100 "are typically formed in floodplains, lakes, and wetlands." Kienle opined the excavation and fill damaged two wetland/floodplain Areas. His opinion is based on his historic knowledge of the area and his personal inspection in June 2007. Plaintiff also submitted a 1989 National Wetland Inventory (NWI) compiled by the Fish and Wildlife Service that identified a "Palustrine wetland" in the area encompassed by Lot 100. The City acknowledges the existence of the 1989 NWI, but observes such an inventory "does not define the limits" of CWA jurisdiction.

In any event, the City submitted the Affidavit of civil

82 - OPINION AND ORDER

engineer and landscape artist Paul Agrimis in which he testified "[j]urisdictional wetlands are not [currently] present on WHI." Agrimis also testified a recent inspection did not show wetland indicators based on the condition of the soil:  "[I]f these areas are sufficiently inundated and have suitable soil, we would expect to see some return of wetland like conditions in eight years."

On this record, the Court concludes a genuine issue of material fact exists as to whether there were wetlands on Lot 100 on the date the City installed its sewer pipeline, and, therefore, neither Plaintiff nor the City are entitled to summary judgment.

Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **DENIES** the City's Cross-Motion for Summary Judgment.

**H.    Plaintiff's CWA Claim that the City, acting with the Port, unlawfully decreased the wetland footprint in an area of WHI by using fill to build a road on top of the sewer pipeline, thereby disconnecting the Wet Meadow from the Oregon Slough.**

**1.    Background.**

Plaintiff moves the Court to declare that the City unlawfully decreased the wetlands footprint on WHI in addition to the wetlands on Lot 100 when it used dredged spoils to construct a road on top of the sewer pipeline pursuant to Permit #1482. Plaintiff also contends the dredged spoils were placed in

wetlands not covered by the Permit in violation of § 301(a) of
the CWA.  Plaintiff asserts the Port acted in concert with the
City, and, therefore, both the Port and the City are responsible
for the CWA violation.

The City admits liability for its unlawful disposal of
dredged spoils on 1813 acres of wetlands that were not covered by
Permit #1482 and has prepared a wetland restoration plan for
review at a later date.  The City, however, moves for summary
judgment that it is not liable under the CWA for the unlawful
discharge of dredged spoils other than on these 1813 acres.

In addition, the Port moves the Court to declare that the
Port does not have any responsibility for the City's actions.

**2.   Plaintiff's Motion for Partial Summary Judgment (#712).**

As noted, the City has conceded it used dredged spoils to
build a road over the sewer pipeline it laid across WHI and that
1813 acres of wetlands not included within Permit 1482 were
inadvertently filled with dredged spoils.  Plaintiff argues only
that the City's calculation of the number of acres unlawfully
filled is wrong.

On this record, the Court concludes Plaintiff is entitled to
summary judgment that the City filled an area of WHI without a
permit in violation of 33 U.S.C. § 1311(a).  Plaintiff's concern,
however, appears to be with the remedy for the violation rather
than the City's admitted liability.  Although Plaintiff moves for

84 - OPINION AND ORDER

summary judgment, he avers liability should be allocated at the

"Remedy Phase":

> An on-site equitable remediation will not be
> possible without the Port's consent.  A plan
> to reconnect wetlands 1 and 2 to the Oregon
> Slough on both sides of the sewer pipe has
> been considered, and U.S. Fish and Wildlife
> was very much in favor of this plan.  The
> Port *because of future development plans* will
> deny this remediation.  The City would prefer
> to exclude the Plaintiff from the selection
> of an equitable remedy, but *the Port should
> be present at the penalty phase for this
> violation of the CWA with the City*.  The City
> is willing to take on the liability, but
> because the Port's *future plans* negate the
> reality of permanent rehabilitation on [the
> impacted wetlands], the City is unable to
> assume the liability.  Therefore, short of a
> settlement of the suit with the Plaintiff, or
> the discovery of a statute that indemnifies
> the City for less than complete remediation,
> the City cannot assume all the liability.
> The Port should shoulder its responsibility
> for this CWA violation.

Pl.'s Reply at 6 (emphasis in original).

Plaintiff brought this action under the citizen-suit

provisions of the CWA, 33 U.S.C. § 1365.  Although he may be

entitled to a determination of liability, he is not entitled

to participate in or to dictate the terms of the remedy.

*See Saboe v. Oregon,* 819 F. Supp. 914, 918 (D. Or. 1993)

("Plaintiffs are not entitled to a 'personalized' remedy in CWA

citizen suits.").  *See also Hudson River Fishermen Ass'n v.

Westchester County*, 686 F. Supp. 1044, 1052 (S.D.N.Y. 1988).

Accordingly, the Court **GRANTS** Plaintiff's Motion for Partial

Summary Judgment only to the extent that the City is deemed liable for its unpermitted discharge of dredged spoils on WHI.

### 3. **City's Cross-Motion for Summary Judgment (#781)**.

As noted, the City has conceded it filled 1813 acres of WHI that were not authorized to be filled under Permit 1482. The City, however, moves for summary judgment that the WHI wetlands it filled without a permit do not exceed 1813 acres.

The City points out that Judge Jones previously upheld the Corps's 1997 wetlands delineation that established CWA jurisdiction over wetlands below 12 feet NGVD on WHI. *See* Opin. and Order at 22 (Mar. 19, 2004). The City submitted surveys and maps reflecting the jurisdictional limits of wetlands on WHI to support its contention that it did not place any dredged spoils in areas below 12 feet NGVD and, therefore, did not fill any wetlands other than the 1813 acres already identified.

The Court notes the City's restoration plan for the unpermitted fill is pending further action by the Corps. Since the Corps is the agency charged with enforcing its permits, it is responsible for determining the extent of the City's unpermitted fill activity and then assessing the adequacy of the City's restoration plan, which is based on the City's view that it filled 1813 acres without a permit. The Court concludes it is appropriate to deny the City's Motion with leave to renew after the Corps has the opportunity to review and to take action on the

86 - OPINION AND ORDER

City's restoration plan.

Accordingly, the Court **DENIES** the City's Cross-Motion for Summary Judgment with leave to renew after the Corps completes its review of the City's restoration plan.


### 4.   Port's Cross-Motion for Partial Summary Judgment (#760).

Plaintiff contends the Port directly participated in and economically benefited from the City's unlawful discharge of dredged spoils into the wetlands.   The Port responds there is not any evidence that it participated in or had responsibility for controlling work performed by the City regarding the road construction that gave rise to the unauthorized discharge of dredged spoils.  Accordingly, the Port moves for summary judgment against Plaintiff's claim.

Plaintiff asserts the Administrative Record for Permit #1482 reflects the Port was copied on documents relating to the work performed under that Permit and the Port attended one or more meetings to discuss contract requirements for the work.

The Court, however, agrees with the Port that there is not any evidence to establish that the Port cooperated in, endorsed, controlled, or specifically was aware that the City was discharging dredged spoils in areas not covered by Permit #1482.

On this record, therefore, the Court concludes the Port is

entitled to summary judgment that it is not liable for any unlawful disposal of dredged spoils by the City in an area not covered by Permit #1482.  The Court, therefore, **GRANTS** the Port's Cross-Motion for Partial Summary Judgment.

I.    **Plaintiff's Constitutional Claim that the Corps violated his Ninth Amendment right to access Public Trust Lands on WHI by not complying with the Water Rights Development Act.**

　　1.    **Background.**

Plaintiff moves the Court to declare the Corps interfered with Plaintiff's right under the Ninth Amendment of the United States Constitution to access Public Trust lands on WHI by permitting the Port to deposit dredged spoils on WHI beaches. This claim is a variation on a theory that this Court already denied on summary judgment.

In his earlier Motion, Plaintiff alleged the Port, following its purchase of land on WHI from both PGE and others (the Gateway Triangle), alienated Plaintiff's right under the Ninth Amendment to the United States Constitution to use that land for purposes of navigation.  In defending against Plaintiff's first effort to assert a claim arising under the Public Trust Doctrine, the Port noted Plaintiff failed to identify "any federal law that provides [Plaintiff] a right of action for the alleged violation of rights encompassed by [the Public Trust] Doctrine." *See* Opin. and Order at 61 (issued Sept. 12, 2005).  In addition, the Port argued any

determination of Plaintiff's Public Trust right and the Port's
alleged alienation of that right must be determined according to
Oregon state law.  This Court agreed with the Port that the issue
raised by Plaintiff was a matter of state law over which this
Court did not have subject-matter jurisdiction:

> [T]itle to the land under navigable waters
> within a state's boundaries is determined by
> that state's law, not federal law.  *Montana*,
> 450 U.S. at 551.  "Whether the State retains
> in trust for the public the same title to
> [the state's] lake beds and the same fishing
> and hunting rights in [the state's] waters
> . . . is, therefore, entirely a matter of
> [state] law, subject only to the exercise
> by the United States of one of its consti-
> tutional powers." *Id.*; *Corvallis Sand and
> Gravel,* 429 U.S. at 371-72; *Shively v.
> Bowlby,* 152 U.S. 1 (1894))("The whole
> question is for the state to determine for
> itself; it can say to what extent it will
> preserve its rights of ownership in them, or
> confer them on others.").

*See* Opin. and Order at 63-64 (issued Sept. 12, 2005).  The Court
also concluded it lacked supplemental subject-matter jurisdiction
under 28 U.S.C. § 1367(a) because Plaintiff's Public Trust claim
regarding the denial of his right of access to areas of WHI was
not sufficiently related to his federal CWA, APA, and NEPA claims
that it formed part of the same case or controversy.  *See* Opin.
and Order at 65-68 (issued Sept. 12, 2005).

    **2.**  **Plaintiff's Motion for Partial Summary Judgment (#723)**.

    Plaintiff asserts he "has an absolute right to use the area
below the ordinary high water line" on WHI "as well as portions

89 - OPINION AND ORDER

of the Columbia River that have been restricted as private property, yet have been enhanced or nourished by the 'Ordinary High Water Line.'"  Plaintiff moves the Court to declare:

(1) the Corps violated Plaintiff's constitutional right to use navigable waters as they existed at statehood unless those rights were properly alienated or preserved by the Water [Resources] Development Act;

(2) lower Columbia River beach enhancements shall not raise beaches beyond or above the "Bankfull Stage" as it is defined by the State of Oregon and shall not establish title to "fast land" unless that property is sold by the State Land Board.

In support of his Motion, Plaintiff alleges the Corps violated the federal 1986 Water Resources Development Act (WRDA), which governs cost-sharing agreements for channel maintenance, and Corps Engineering Regulation ER 1165-2-130, which addresses "Federal Participation in Shore Protection."  Plaintiff alleges these violations occurred when the Corps allowed the Port to fill submerged lands on WHI with dredged spoils and caused those lands to become uplands cut off from the Columbia River.  Plaintiff also asserts the Corps's WRDA violation constitutes a separate violation of Plaintiff's Fifth and Ninth Amendment rights "to walk and recreate below [the Ordinary High Water Line] along waters of the United States" such as those at WHI.

The Corps opposes Plaintiff's Motion and moves for summary

90 - OPINION AND ORDER

judgment on the grounds that the Court already has determined it lacks subject-matter jurisdiction over Plaintiff's Public Trust claim and neither the WRDA nor the Corps's implementing regulations have any bearing on Plaintiff's constitutional claims.

The fundamental issues are (1) whether the Corps failed to comply with the 1986 WDRA and its own engineering regulation implementing the WDRA with respect to WHI and, if so, (2) whether the lack of the Corps's compliance implicates any rights that Plaintiff may have under the Public Trust Doctrine.

       **a.**   <u>**1986 WRDA**</u>.

Congress periodically issues WRDAs to appropriate funds for the construction, operation, and maintenance of new navigation projects.  33 U.S.C. § 2211 (a) and (b).  The 1986 WRDA included, *inter alia*, federal and nonfederal cost-sharing provisions and agreements for "constructing land-based and aquatic dredged material disposal facilities that are necessary for the disposal of dredged material required for the operation and maintenance of a project . . . ."  33 U.S.C. § 2211(b)(2), (d),(e).

The WRDA does not specifically address issues of public access to beaches on WHI because such access invokes rights under the Public Use Doctrine, which are matters reserved to the State of Oregon.  Accordingly, the Court finds there is not a rational

91 - OPINION AND ORDER

connection between the WRDA's cost-sharing requirements and Plaintiff's constitutional claims.

> **b.**   **ER 1165-2-30**.

In the absence of a specific provision in the WRDA to support his position, Plaintiff relies on the Corps's June 1989 ER 1165-2-130, which is applicable to projects that are governed by the 1986 WRDA.

As noted, ER 1165-2-130 consists of "policies and guidelines for determining the extent of Federal participation in potential Federal projects for protection from shore erosion, . . . or losses to coastal resources and/or development." Section 6(a)(3) sets forth relevant "Program Policies" as to placement of dredged material on beaches:

> It is Corps policy to participate in the additional cost for placing beach-quality sand or other suitable material, dredged by the Corps during construction or maintenance of Federal navigation projects, onto adjacent beaches or near shore waters subject the following:
>
> > (a) Placement of the material on a beach or beaches and Federal (Corps) participation in the costs must be requested by the State in which the beach or beaches are located;
> >
> > (b) The added cost of disposal must be justified by the benefits associated with the protection of such beach or beaches;
>
> *   *   *

> (d) *The beaches involved must be open to the public.*
>
> (e) The placement must be environ-mentally acceptable, pursuant to all applicable statutes and regulations.

(Emphasis added.)  Plaintiff asserts this regulation has the force of law and is binding on the Corps.  The Court disagrees.

The Court previously concluded the Corps's Engineering Regulations are interpretative rather than substantive rules because they are not published in the Federal Register or the Code of Federal Regulations and reflect general policy statements and guidelines.  Thus, the Engineering Regulations are not legislative in nature; do not have the force and effect of law; and, therefore, are not reviewable by the Court.  *See Alameda Gateway,* 213 F.3d at 1168.

Accordingly, the Court concludes the Corps's alleged noncompliance with ER 1165-2-130 is not subject to review by the Court and does not give rise to a claim under the WRDA.

## c.  **Public Trust Doctrine**.

The Court incorporates its discussion of the Public Trust Doctrine from its earlier Opinion and Order issued September 12, 2005, in which the Court emphasized any rights conferred over the beds of navigable waters are governed by state law.  "The State's power over the beds of navigable waters remains subject to only one limitation:  the paramount power of

the United States to ensure that such waters remain free to interstate and foreign commerce." *United States v. Oregon*, 295 U.S. 1, 14 (1935).  The issues in this case do not involve any claim based on interference of the Corps or the Port with the federal government's role in protecting the navigability of its waters.  To the contrary, the Corps's actions that give rise to Plaintiff's constitutional claim occurred during the course of maintaining and enhancing the navigation channel of the Columbia River.  In fact, the dredged spoils deposited on WHI are the product of the Corps's fulfillment of its obligation to protect that navigation channel for purposes of interstate and foreign commerce, and Plaintiff has not asserted the Corps failed to meet that obligation.

Nevertheless, Plaintiff again contends the Corps's actions interfered with Plaintiff's Ninth Amendment right of public access to beaches on WHI.  For good measure, Plaintiff also adds the due-process clause of the Fifth Amendment as a source of federal jurisdiction.  As noted, however, the State of Oregon, is the entity with the paramount right and interest to preserve access to such beaches under the Public Trust Doctrine.

On this record, therefore, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment.

**3.    The Corps's Cross-Motion for Summary Judgment (#820).**

For the reasons stated above, the Court **GRANTS** the Corps's

94 - OPINION AND ORDER

Cross-Motion for Summary Judgment.

### VIII.   <u>CONCLUSION</u>

**For the foregoing reasons, the Court makes the following rulings as to the parties' evidentiary motions:**

**A.**   The Court **GRANTS** the Port's Motion to Strike Plaintiff's 25th Affidavit (#703) in its entirety.  The Port's Motion to Strike is incorporated in its Motion for Partial Summary Judgment (#752).

**B.**   The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 19th Affidavit (#707).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#753).

**C.**   The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 20th Affidavit (#876), 21st Affidavit (#736), and 8th Motion for Judicial Notice (#736).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#767).

**D.**   The Court **GRANTS in part** and **DENIES in part** the Port's Motion to Strike Plaintiff's 22nd Affidavit (#740).  The Port's Motion to Strike is incorporated in its Cross-Motion for Partial Summary Judgment (#768)**,** and the Corps joins in the Port's Motion to Strike**.**

**E.**   The Court **DENIES as moot** the Corps's Motion to Strike (#800)

95 - OPINION AND ORDER

Plaintiff's 20th Affidavit (#876), 21st Affidavit (#736), 22nd Affidavit (#740), and 29th Affidavit (#741) on the ground that it is superseded by the Corps's Motion to Strike (#923).

**F.**   The Court **GRANTS in part** and **DENIES in part** the Corps's Motion to Strike (#923) Plaintiff's 20th Affidavit, **GRANTS** the Corps's Motion to Strike (#923) Plaintiff's Amended 29th Affidavit (#879), **GRANTS in part** and **DENIES in part** the Corps's Motion to Strike (#923) Jeri Benton's Affidavit (#880), and **DENIES** the Corps's Motion to Strike (#923) Clive F. (Rick) Kienle, Jr.'s First Affidavit (#881).  The Port joins in the Corps's Motion to Strike Jeri Benton's Affidavit and Kienle's First Affidavit.

**G.**   The Court **GRANTS** the Port's Motion to Strike (#962) Clive F. (Rick) Kienle, Jr.'s Second Affidavit (#943).

**For the foregoing reasons, the Court makes the following rulings as to the parties' summary-judgment motions:**

**A.**   <u>**APA Claim - ATF Permit**</u>**.**

1.   The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#725) that the Corps's issuance of the 2005 After-the-Fact Permit 200100062 (ATF Permit) to the Port was arbitrary, capricious, and otherwise contrary to law.

2**.**   The Court **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#761) and **GRANTS** the Corps's Cross-Motion for

Summary Judgment (#846).

**B.**   **APA Claim - Verification of Boundary Change**.

1.   The Court **DENIES** Plaintiff's Motion for Partial
Summary Judgment (#729) that the Corps's issuance of the 2006
Verification of Permanent Change of Boundaries (Verification of
Boundary Change) for purposes of CWA jurisdiction was arbitrary,
capricious, and otherwise contrary to law.

2.   The Court **GRANTS** the Port's Cross-Motion for Partial
Summary Judgment (#768) and **GRANTS** the Corps's Cross-Motion for
Summary Judgment (#849).

**C.**   **APA Claim - 1998SEIS, 2003CDEIS, ATF Permit**.

1.   The Court **DENIES as moot** Plaintiff's Motion for Partial
Summary Judgment (#719) that the Corps violated the APA by
failing to comply with Executive Order (EO) 11988 when it issued
the 1998 Supplemental Environmental Impact Statement (1998SEIS)
and also **DENIES** Plaintiff's Motion as to the 2003 Channel-
Deepening Environmental Impact Statement (2003CDEIS) and the ATF
Permit to the Port.

2.   The Court **GRANTS** the Port's Motion for Partial Summary
Judgment (#767) as to Plaintiff's APA claim and **GRANTS** the
Corps's Cross-Motion for Summary Judgment (#827).

**D.**   **NEPA Claim - 1998SEIS, 2003CDEIS, ATF Permit**.

1.   The Court **DENIES** Plaintiff's Motion for Partial Summary

Judgment (#716) that the Corps's 1998SEIS, 2003CDEIS, and ATF Permit did not comply with NEPA.

2.    The Court **GRANTS** the Port's Motion for Partial Summary Judgment (#767) as to Plaintiff's NEPA claim and **GRANTS** the Corps's Cross-Motion for Summary Judgment (#824).


**E.    CWA Claim - Containment Dike, Wet Meadow.**

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#700) that the Port did not have a CWA permit when it used dredged spoils to build a containment dike on West Hayden Island (WHI) in 1997 and filled the "Wet Meadow" from 1995-97.[14]

2.    The Court **DENIES as moot** the Port's Cross-Motion for Partial Summary Judgment (#752) as to Plaintiff's claim that the Port filled 1.19 acres of wetlands on WHI without a CWA permit and **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#752) that the Port did not fill an additional 20 acres of waters on WHI without a CWA permit.

**F.    CWA and APA Claim - Tide Gates, Culverts.**

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#704) that the Port unlawfully installed tide gates and culverts at WHI in violation of the CWA and the APA.

---

[14] The term "Wet Meadow" was coined by Plaintiff and does not have an official meaning.

2.    The Court **GRANTS in part** and **DENIES in part** the Port's Cross-Motion for Partial Summary Judgment (#753).

**G.    CWA Claim - Lot 100.**

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#708) that the City unlawfully filled a wetland on Lot 100 adjacent to Canoe Bay on WHI.

2.    The Court **DENIES** the City's Cross-Motion for Summary Judgment (#766).

**H.    CWA Claim - Permit #1482.**

1.    The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment (#712) that the City is liable for the unpermitted discharge of dredged spoils on WHI in an area not covered by Permit #1482 and **DENIES** the remainder of Plaintiff's Motion.

2.    The Court **DENIES** the City's Cross-Motion for Summary Judgment (#781) limiting its liability for the unpermitted discharge of dredged spoils on WHI to 1813 acres with leave to renew after the Corps completes its review of the City's proposed restoration plan.

3.    The Court **GRANTS** the Port's Cross-Motion for Partial Summary Judgment (#760) that it is not liable for the City's unpermitted disposal of dredged spoils in an area of WHI not covered by CWA Permit #1482.

**I.    Ninth Amendment Constitutional Claim.**

1.    The Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (#723) in which he seeks "Declaratory Relief" that the Corps violated Plaintiff's right under the Ninth Amendment to the United States Constitution to access Public Trust Lands on WHI by failing to comply with the Water Rights Development Act, 33 U.S.C. § 2211(a) and (b), and its implementing regulations.

2.    The Court **GRANTS** the Corps's Cross-Motion for Summary Judgment (#820).

IT IS SO ORDERED.

DATED this 28th day of February, 2008.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

## APPENDIX

The Opinions and Orders listed below disposed of or resulted ultimately in final disposition of claims in this case.[15]

Mar. 22, 2002 (#183):    Dismissed Plaintiff's CWA claim against Defendant Portland General Electric (PGE).

Apr. 5, 2002  (#187):    Dismissed Plaintiff's APA claims against Defendant EPA based on violations of CWA § 505(a)(2).

May 6, 2002   (#195):    Dismissed Plaintiff's CWA claims against Defendant Port of Portland arising from the Port's dredging activities that occurred before the CWA was enacted.

Aug. 11, 2003 (#269):    Declared waters around WHI are nontidal and the Ordinary High Water Mark rather than the High Tide Line sets the jurisdictional boundary for waters of the United States on the Columbia River, and declared hydrology, vegetation, and soil conditions on WHI determine the CWA's jurisdiction on WHI.

Mar. 5, 2004  (#337):    Dismissed Plaintiff's CWA claim against the EPA based on the EPA's failure to take enforcement action against Defendant

---

[15] Opinions and Orders issued before June 21, 2004, were issued by Judge Jones.

Corps's determination of the CWA juris-
jurisdictional boundary at WHI.

Mar. 19, 2004 (#341):    Upheld the Corps's 1997 Wetlands
Delineation at WHI.

Sep. 20, 2004 (#373):    Dismissed Plaintiff's APA claim against
the Corps for authorizing the Port to
place fill on WHI before December 29,
1994.

Sept. 9, 2005 (#563):    Dismissed Plaintiff's claim that the EPA
unlawfully failed to enforce the CWA when
it did not challenge the Corps's decision
that the jurisdictional boundary of the
CWA at WHI is the Ordinary High Water Mark
rather than the High Tide Line);

dismissed Plaintiff's APA claim that the
Corps violated the CWA when it withheld
information and concealed the true nature
of the Corps's permit actions at WHI;

dismissed Plaintiff's CWA claim that
Defendant City of Portland unlawfully
filled areas of WHI in 1995 during the
City's construction of a chlorine-
removal building on WHI;

dismissed Plaintiff's CWA claim that the
City unlawfully disposed of demolition
debris in United States waters near
Portland International Raceway;

dismissed Plaintiff's CWA claim that the
City engaged in illegal fill on WHI in
1995;

dismissed Plaintiff's CWA claim that
the Port unlawfully placed fill on WHI
before July 30, 1994;

dismissed Plaintiff's CWA claim that the
the Port violated Permit 5254, which the
Corps had previously issued to PGE; and

dismissed Plaintiff's claims against

102 APPENDIX

the Port as to the Public Trust
Doctrine and as to the Port's ownership of
the "Gateway Triangle."

103 APPENDIX